**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CHRISTOPHER WILLIAMS,

      Plaintiff,

  v.

FORMER ASSISTANT DISTRICT
ATTORNEY DAVID E. DESIDERIO;
FORMER ASSISTANT DISTRICT
ATTORNEY DAVID WEBB; FORMER
DISTRICT ATTORNEY LYNNE
ABRAHAM, *individually*; CITY OF
PHILADELPHIA, PENNSYLVANIA;
PHILADELPHIA DISTRICT ATTORNEY'S
OFFICE; FRANCES ANSEL
CHARLES BENTHAM; MICHAEL BURKE;
JOHN CIMINO; RAYMOND DOUGHERTY
ARTHUR DURRANT; JOHN GRIER;
RICHARD HARRIS;
THE ESTATE OF JOSEPH HASARA;
FRANK JASTRZEMBSKI; FRANK
MARGERUM; FRANK MILLER;
JAMES MORTON; THE ESTATE OF
CHARLES PERMINT; GREGORY RODDEN;
MANUEL SANTIAGO; and
RALEIGH WITCHER,

      Defendants.

**DEMAND FOR JURY TRIAL**

---

**COMPLAINT**

---

**TABLE OF CONTENTS**

NATURE OF THE ACTION…………………………………………………………………1

JURISDICTION AND VENUE………………………………………………………………2

THE PARTIES…………………………………………………………………………………3

FACTS APPLICABLE TO ALL COUNTS…………………………………………………6

   I.    <u>The Murders</u>………………………………………………………………………....7

       A.    The Murder of William Graham on February 18, 1989……………………………..7

       B.    The Murder of Marron Genrette on June 25, 1989………………………………7

       C.    The Murders of Otis Reynolds, Gavin Anderson, and
             Kevin Anderson on September 25 or September 26, 1989…………………………8

             *The Murder of Otis Reynolds*……………………………………………………...9

             *The Murder of Kevin Anderson*……………………………………………..10

             *The Murder of Gavin Anderson*……………………………………………..12

             *Police Quickly Confirmed that the Victims Had a History of Violent*
             *and Drug-Related Activity, Were Involved With a Notoriously Violent Gang,*
             *and Were Involved in Conflict Between Warring Gangs*…………………………...14

             *Police Identify a Drug Kingpin Known as "Steplight"*
             *as the "Prime Suspect" in the Anderson/Reynolds Murders*………………………15

             *Police Identify Still Other Suspects for the Anderson/Reynolds Murders*
             *Based on Numerous Gunfights in Which the Men Were Involved ,*
             *but Do Not Investigate the Alternative Suspects or Disclose Them to Williams*……...21

       D.    The Murder of Michael Haynesworth on November 21, 1989……………………..25

             *Investigation into Haynesworth's Murder Immediately Implicates James White*………25

             *PPD Arrests James White for the Haynesworth Murder*…………………………..26

             *Defendants Continued to Coerce James White and Used Him*
             *to Fabricate a Series of False Statements Implicating Williams and Others*…………..28

             *ADA Desiderio Attempts to Coerce Theophalis Wilson*
             *into Testifying Against Williams*……………………………………………..35

i

*Lynne Abraham and David Webb Approve Seeking
the Death Penalty Against Williams*……………………………………………...36

II.      The Trials……………………………………………………………………………...37

III.     Appeals and Post-Conviction…………………………………………………………39

IV.      The City of Philadelphia Perpetrated a Pattern and Practice of Abuses………………..47

    A.   The DA's Office had policies, patterns, and practices that ensured
       criminal defendants were not given material exculpatory information……………..48

    B.   PPD maintained a policy, practice, or custom of suppressing
       exculpatory evidence, fabricating evidence, coercing
       confessions, and other unconstitutional investigative practices……………………51

    C.   Defendants PPD and the DA's Office maintained unconstitutional
       policies, practices, and customs of coercing confessions from witnesses…………..56

    D.   PPD maintained a policy, pattern, practice, and custom of
       failing to adequately train, supervise, or discipline officers…………………………60

    E.   The DA's Office and PPD had policies, patterns, and
       practices that intentionally discriminated against Black men…………………………64

V.       Defendants Institutionally Discriminated Against Williams Because He is Black………64

CLAIMS…………………………………………………………………………………..64

PRAYER FOR RELIEF…………………………………………………………………....127

JURY DEMAND…………………………………………………………………………..127

Plaintiff Christopher Williams, by and through his attorneys, Ben Crump Law, Hart McLaughlin & Eldridge, LLC, and McEldrew Young Purtell Merritt complains as follows against Defendants Former Assistant District Attorney David E. Desiderio; Former District Attorney Lynne Abraham, individually; City of Philadelphia, Pennsylvania; Philadelphia District Attorney's Office; Philadelphia Police Department ("PPD") Detective Frances Ansel; PPD Detective Charles Bentham; PPD Detective Michael Burke; PPD Detective John Cimino; PPD Detective Raymond Dougherty; PPD Detective Arthur Durrant; PPD Detective John Grier; PPD Detective Richard Harris; the Estate of (PPD Detective) Joseph Hasara; PPD Detective Frank Jastrzembski; PPD Detective Frank Margerum; PPD Detective Frank Miller; PPD Detective James Morton; the Estate of (PPD Detective) Charles Permint; PPD Detective Gregory Rodden; PPD Detective Manuel Santiago; and PPD Detective Raleigh Witcher:

## NATURE OF THE ACTION

1.     Christopher Williams seeks justice for over 30 years he spent as an innocent man on death row. Mr. Williams was put there by the knowing and purposeful misconduct of Philadelphia ADA David Desiderio and numerous Philadelphia Police Department Detectives. Among Defendants' many sins, they coerced a 19-year-old admitted murderer and informant to fabricate a story implicating Christopher Williams and others in several murders.

2.     Christopher Williams was charged and tried for *six* such murders, which occurred in separate incidents in Philadelphia in the late 1980s. All told, Mr. Williams was acquitted of two of those murders and convicted of the remaining four, resulting in his death sentence.

3.     Only through Mr. Williams' dogged pursuit of appeals and post-conviction petitioning and the review of the newly formed Conviction Integrity Unit of the Philadelphia District Attorney's Office, did the truth come to light. Mr. Williams is innocent of the murders for he was charged, but was railroaded by corrupt prosecutors and police.

1

4.      Indeed, public filings by the Conviction Integrity Unit show that ADA Desiderio and PPD Detectives covered-up evidence, buried leads, and fabricated evidence to arrest and convict Mr. Williams and others. As the District Attorney's Office admitted in dropping all charges against Mr. Williams, his "conviction was built on a house of cards that began to collapse in 2019 when the Commonwealth opened up its files to [Mr. Williams for the first time]. Once the light was allowed to shine, the Commonwealth was forced to see that the basic structure underpinning [his] conviction was built on the unscrupulous behavior of several bad actors[,]" including ADA Desiderio and PPD Detectives.

5.      While the *number* of murders Defendants falsely and callously prosecuted Mr. Williams for may be unique, Defendants' tactics were not. The City of Philadelphia—its District Attorney's Office and Police Department, the very foundations of its legal system—employed policies, patterns, practices, and customs designed to convict innocent men like Mr. Williams, particularly Black men. They buried leads; they hid and destroyed evidence of alternative suspects; and they coerced troubled teenagers to tell fictitious stories to fit the evidence. And they did it all to obtain convictions at any cost, despite the truth.

6.      For these reasons, Mr. Williams's lawsuit targets the City's practices on a larger scale as well, pursuant to *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978).

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 in that claims in this action arise under the United States Constitution.

8.      To the extent that some of Plaintiff's claims arise under Pennsylvania state law, the Court has supplemental subject matter jurisdiction over those claims under 28 U.S.C. § 1367(a).

9.      The Court has personal jurisdiction over Defendants because they reside in the State of Pennsylvania and because their conduct described herein occurred exclusively in Pennsylvania.

10.     Venue is proper in this Court because Christopher Williams's injuries and damage occurred in the Eastern District of Pennsylvania, Defendants reside and conduct business in the Eastern District of Pennsylvania, and virtually all of the occurrences described herein occurred in the Eastern District of Pennsylvania.

## THE PARTIES

11.     Plaintiff Christopher Williams is a resident of the Commonwealth of Pennsylvania and resides in Philadelphia. He is a Black man. He was wrongfully arrested and tried for six murders, convicted of four of them, and incarcerated for over 30 years until his release from prison on February 9, 2021.

12.     Defendant City of Philadelphia is a political subdivision of the Commonwealth of Pennsylvania and a municipal corporation, which at all relevant times was the employer of the individual defendants. The City of Philadelphia is and was at all times relevant to this Complaint responsible for the policies, practices, patterns, and customs of the Philadelphia District Attorney's Office and the Philadelphia Police Department ("PPD").

13.     Defendant David E. Desiderio is a natural person who at all relevant times was an Assistant District Attorney with the Philadelphia District Attorney's Office. ADA Desiderio investigated and then prosecuted all six of the murders for which Christopher Williams was charged and tried.

14.     Defendant David Webb is a natural person who at all relevant times was an Assistant District Attorney with the Philadelphia District Attorney's Office. At all relevant times, Mr. Webb was the Chief of Homicide in the Philadelphia DA's Office and supervised the prosecutions at issue.

15.     Defendant Lynne Abraham, individually, is a natural person, who at all relevant times was the elected Philadelphia District Attorney.

16.     Defendant Frances Ansel was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

17.     Defendant Charles Bentham was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

18.     Defendant Michael Burke was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

19.     Defendant John Cimino was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

20.     Defendant Raymond Dougherty was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

21.     Defendant Arthur Durrant was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

22.     Defendant John Grier was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

23.     Defendant Richard Harris was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

24.     Defendant Estate of Joseph Hasara is the representative of Defendant decedent Joseph Hasara, who was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

25.     Defendant Frank Jastrzembski was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

26.     Defendant Frank Margerum was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

27.     Defendant Frank Miller was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

28.     Defendant James Morton was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

29.     Defendant Estate of Charles Permint is the representative of Defendant decedent Charles Permint, who was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

30.     Defendant Gregory Rodden was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

31.     Defendant Manuel Santiago was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

32.     Defendant Raleigh Witcher was at all relevant times a Detective with the PPD responsible for investigating one or more of the murders for which Christopher Williams was charged and tried.

## FACTS APPLICABLE TO ALL COUNTS

33.     In 1989, Christopher Williams was a 30-year-old father and carpenter living in Philadelphia.

34.     What happened to Mr. Williams shortly thereafter is chilling. Mr. Williams was targeted, tried, and convicted of the murders of several men, all due to a campaign by Defendants of coercing witnesses, fabricating testimony, ignoring obvious and "prime" alternative suspects in the murders, and concealing exculpatory evidence and obvious alternative suspects. Defendants sent Mr. Williams to death row.

35.     Defendants' ostensible theory was that Mr. Williams ran a gang who robbed and killed drug dealers. The Philadelphia DA's Office, through its newly-formed Conviction Integrity Unit, has since admitted in public filings that this theory was ludicrous, if ever believed at all.  Mr. Williams had absolutely nothing to do with these murders, and ADA Desiderio and PPD Detectives knew it.

36.     The details surrounding each of the six murders, and the ensuing investigations, are crucial to understanding Defendants' mendacity in pursuing Christopher Williams (and certain others, including Theophalis Wilson) for these murders. Such details show that Christopher Williams was not in any fashion implicated in these murders—not by physical evidence, not by eyewitness testimony, not by personal history, and not by any witness's statement—until after ADA Desiderio and the PPD began coercing a 19-year-old admitted murderer, James White, to invent testimony against Williams and others. Such details also show the myriad facts and suspects buried and ignored in the process of convicting Mr. Williams and other innocent men.

## I. The Murders

### A. The Murder of William Graham on February 18, 1989

37.     On February 18, 1989, William Graham, a 60-year-old cab driver, was shot in the back of the head in his cab. He was found in the cab by nearby residents sometime after he had been shot.

38.     PPD investigated the murder and interviewed witnesses in the days immediately following the shooting.

39.     According to police files, the immediate investigation implicated a man named Albert Leach in the murder.

40.     During the immediate investigation, Christopher Williams was never mentioned in relation to this murder. No evidence linked Christopher Williams to the murder in any fashion – no witness, no forensic or physical evidence. Naturally, Christopher Williams was not arrested, questioned, or mentioned during this immediate investigation into the Graham murder.

### B. The Murder of Marron Genrette on June 25, 1989

41.     On June 25, 1989, Marron Genrette, a 19-year-old man suspected of drug dealing or working for a suspected drug dealer named David Perez, was shot-gunned to death in the doorway of an apartment.

42.     In the month immediately following the murder, in June and July 1989, PPD Detectives investigated Mr. Genrette's homicide and interviewed witnesses. Defendant Detective Richard Harris played a central role in that investigation and handled the interviews of many of those witnesses. Defendant Detective Raleigh Witcher also played a role in that investigation.

43.     PPD's investigation immediately implicated several men in the Genrette murder—none of them Christopher Williams. The men implicated included Albert Leach, Terrence Smith, and Larry Davis. When Terrence Smith was interviewed by police, he in turn implicated another man, Anthony Davis, who had previously implicated Terrence Smith in the murder.

44.     During the immediate investigation, Christopher Williams was never mentioned in relation to the Genrette murder. No evidence linked Christopher Williams to the murder in any fashion – no witness, no forensic or physical evidence. Naturally again, Christopher Williams was not arrested, questioned, or mentioned during this immediate investigation into the Genrette murder.

### C.     The Murders of Otis Reynolds, Gavin Anderson, and Kevin Anderson on September 25 or September 26, 1989

45.     On September 25 or 26, 1989, three young men—Otis Reynolds, Gavin Anderson, and Kevin Anderson—were shot to death in Philadelphia.

46.     Defendant PPD Detectives Frances Ansel, John Cimino, Raymond Dougherty, John Grier, Richard Harris, Joseph Hasara, Frank Jastrzembski, Frank Margerum, Frank Miller, James Morton, Charles Permint, Gregory Rodden, and Manuel Santiago directly participated in the investigation of the Anderson/Reynolds murders by gathering evidence, obtaining witness statements, responding to and examining crime scenes, and creating and documenting investigative reports and activity sheets.

47.     Defendant PPD Detectives Raleigh Witcher, Michael Burke, and Arthur Durrant were supervisors of the Anderson/Reynolds murder investigation. As such, they were responsible for supervising the methods of investigation as well as all evidence gathered and statements obtained. They were also responsible for providing direction and guidance to uniformed officers and detectives with respect to how to handle such investigation.

48.     The PPD, through the above detectives, investigated the Anderson/Reynolds murders in the two weeks immediately following their occurrence. The investigation revealed that Otis Reynolds, Gavin Anderson, and Kevin Anderson were well-known for dealing drugs as well as sticking-up and violently assaulting others at gunpoint. Further, investigation revealed that the three men very likely associated with a gang known as the Jamaican Shower Posse which PPD had, just

weeks earlier, documented in an internal memorandum as being "at war" with another prominent Philadelphia gang, the Junior Black Mafia.

49.     As further detailed below, the three men had been involved in numerous situations and altercations in the weeks leading to their deaths which could have resulted in deadly retaliation.

50.     Not a single such event or altercation involved or related to Christopher Williams. Christopher Williams had no connection to the Anderson brothers or Reynolds in any way.

51.     Furthermore, as set forth below, given that the details of this triple murder pointed to numerous alternative suspects—and not to Christopher Williams in any fashion—and seriously called into doubt the manner and timeline of the victims' deaths as the Commonwealth would later present it through their key witness, James White, there is no doubt Defendants knew what they were doing when they coerced and fabricated testimony implicating Christopher Williams and others, as well as when they failed to turn over any of the exculpatory evidence demonstrating that their case against Williams was ludicrous.

### The Murder of Otis Reynolds

52.     Otis Reynolds was found shot to death at 1235 W. College Avenue in Philadelphia, Pennsylvania, on September 25, 1989. Mr. Reynolds was a 5'11, 250-pound black man.

53.     Mr. Reynolds' body was first found lying in the street by Denise Washington at 10:45 p.m., as she was walking her baby in a stroller. Thinking Reynolds was passed-out drunk, she crossed the street to avoid him and walked home. Forty-five minutes later, Washington went outside again and found the man still lying there. She got closer, noticed blood, and knocked on her neighbors' doors until one agreed to call the police. Police arrived on scene at 11:38 p.m.

54.     Mr. Reynolds was found lying on his back with two gunshot wounds to his face and an upper spinal cord contusion. The medical examiner, Dr. Paul Hoyer, reported that Reynolds' body

was soaked in blood, and his clothing was wet. Reynolds was pronounced dead at 1:01 a.m. on September 26, 1989, but the hour of injury on his medical report states only "Late P.M."

### The Murder of Kevin Anderson

55.     At 12:31 a.m. on September 26, 1989 – roughly an hour and a half after Reynolds' body was found – Lisa Perry reported a man with a gun to police near her home at 3102 West Berks Street in Philadelphia. Perry reported that a black male knocked on her door at 11:50 p.m., less than an hour earlier. She noticed that his companion, who was sitting in a car in front of her house, had a gun.

56.     One minute after Perry's 911 call, dispatch instructed all cars to standby for a report of a black male on the highway with a gun. PPD officers Hollinshead and Farrell responded.

57.     Thirteen minutes after Perry's 911 call, a nearby gas station employee working on 33rd and Columbia called 911 to report that someone had knocked on his window and asked him to call police because he had witnessed a man being shot on 32nd and Berks Street, one block away from where Perry reported a man with a gun.

58.     One minute later, police officers instructed dispatch that the report of a person with a gun at 3102 Berks Street was unfounded.

59.     Two minutes after that, dispatch again called in a report of an individual with a gun and a shooting at 32nd and Berks Street. Officers agreed to "ride back around there." Dispatch cautioned the officers to be careful as they had a call for that location earlier. The officers responded, "[t]he last time we were out there . . . there was nobody there. We just left there."

60.     One minute later, the police again told dispatch the call regarding a shooting in the area was unfounded.

61.     Neither the gas station employee nor the eyewitness to the shooting were ever interviewed by law enforcement or, if they were, those interviews were suppressed.

62.     Two hours later, at 3:06 a.m., Cornelius Williams called 911 to report that on his way to work, he walked by a dead body lying "on the school side of the street" at 32nd and Berks Street.

63.     Officers canvassed the Berks Street area and spoke to a local resident who reported having witnessed a white Lincoln driving erratically in the area nearly every night between 10:00 p.m. and 11:00 p.m. In the days before their deaths, the three Victims were reportedly seen in a vehicle matching that description. Officers dismissed this connection.

64.     Seven minutes after Cornelius Williams' 911 call, officers *again* told dispatch to report the call in that area unfounded.

65.     Three hours later, at 6:45 a.m., another resident of the 3200 block of Berks Street called 911 to report a male lying in the street.

66.     This was confirmed by another resident's 911 call reporting the same thing at 7:32 a.m.

67.     At 8:55 a.m., police finally discovered Kevin Anderson's body 20 feet west of 32nd and Berks Street, one and a half miles away from Reynolds' body (which had been found just hours before). A crack vial with white substance was found near Kevin Anderson's body.

68.     Kevin Anderson was a 19-year-old black man, 5'4" and 140 pounds. The Philadelphia medical examiner, Dr. Joseph Aloisi, pronounced Kevin Anderson dead from a gunshot wound to the back of the head at close range, and noted one superficial gunshot wound to the scalp on the left temple. Rigor was fully developed in the jaw and partial rigor was noted in the other joints.

69.     At 6:45 p.m., Perry, the original 911 caller, was interviewed by Defendant Detective Morton. She explained the incident in more detail, indicating that after a knock at her apartment door, she heard a man she knew as "Fred" yell "Stop, Monk, don't do that, man." When Perry looked outside again, she saw Fred's white Thunderbird parked outside with a black male in the passenger seat pointing a silver handgun out the window toward Perry's house. Perry noted that Fred normally drove a 1989 white Lincoln 4-door—the same car the Anderson brothers and Reynolds were

reportedly sighted in before their deaths and the same car other residents reportedly observed in the area that night.

70.     After talking with police, Perry saw men she knew as "Gary" and "Snow" in a green car parked in front of 3401 West Berks Street stripping the car. Perry called 911 as Gary and Snow were known to rob people and steal cars in the area. Officers Hollinshead and Farrell were dispatched. When they arrived to talk to Perry, the men stripping the car ran. After police left, Gary and Snow returned and drove the green car away. Police never followed up on this lead.

71.     Instead of investigating, Detective Morton reported that the incidents Perry told police about the night of the shootings were "unrelated" to the murder of Kevin Anderson. No reason was given for this conclusion.

72.     On September 27, 1989, Defendant Detective Schol interviewed Officer Hollinshead, the patrol officer who responded to the initial Berks Street 911 calls. Officer Hollinshead stated that after the first two calls, he "drove by" 32nd and Berks with Officer Farrell but did not see Kevin Anderson's body lying there until hours later that morning, after several additional 911 calls.

### The Murder of Gavin Anderson

73.     At 8:36 a.m. on September 26, 1989 – thirty minutes before Kevin Anderson's body was discovered – Gavin Anderson was found dead in the 2400 block of West Glenwood Avenue, just a mile from Kevin Anderson's body.

74.     Gavin Anderson had two gunshot wounds to the front of his right ear and was found bleeding from the back of his head. He was found lying on his back with his legs bent and up in the air. His right leg was leaned against a white Cadillac, while his left leg was leaning against a bush. A shell casing was found near the body.

75.     While officers were processing the scene, Kerry Simmons, a resident of the area where Gavin Anderson was found, approached officers and told Defendant Detective Dougherty that at

6:00 a.m. that morning, he drove by the scene and saw the victim arguing with a 6'1" black male

wearing a black jacket and jeans. Simmons saw the assailant making a motion as if he was going to hit

the victim, but when the assailant noticed Simmons, he stopped and put his arm around the victim.

76.     Simmons told police he saw the two men walk together up the hill to where the victim's

body would later be found. Simmons also informed police that he recognized the assailant as someone

he had seen around the neighborhood and the nearby high-rise apartments numerous times.

77.     Subsequently the same day at 10:10 a.m., Detective Dougherty interviewed Simmons.

Simmons gave a consistent account of the incident, a detailed description of the assailant, and stated

that he had seen the assailant five or six times before. Simmons confirmed he would be able to

recognize the assailant if he saw him again.

78.     Gavin Anderson's death certificate indicates that his time of death was "Early A.M."

Police apparently believed that he died between midnight and 3:00 a.m., not 6:00 a.m. as would be

consistent with Simmons' statement to police.

79.     Defendant Detective Jastrzembski conducted a second interview of Simmons at 6:50

p.m. that same night during which he gave a consistent account with what he had told the police

earlier, but because of the police's unfounded assumption regarding Gavin's time of death,

Jastrzembski disregarded Simmons' statement since it did not fit their narrative. Further, Simmons

again noted that he recognized the assailant as a "crackhead" from his neighborhood, at 22nd and

Diamond, the Diamond Street Projects, and insisted that if shown a photo, he would recognize him.

80.     Furthermore, Francis Jarrett, a 42-year-old black woman was near the scene of Gavin

Anderson's murder when police arrived, lived nearby at 2446 West Glenwood Avenue and was

documented by police as a witness. In a later interview, Simmons identified the assailant in Gavin

Anderson's murder as David Jarrett. However, police never questioned Ms. Jarrett about the

identification of a man with the same last name near the scene of the murder, nor did police do any meaningful investigation into this critical lead.

81.     Separately, on the day of Gavin Anderson's murder, police interviewed Evonne Lackey. Ms. Lackey stated that at 11:00 p.m. the night before the murder (September 25, 1989), she was walking through the playground a block from where Gavin Anderson was found when she heard four gunshots and saw a man lying down in the area. Lackey told police that she could recognize the victim if shown a picture, as she knew most of the people in the neighborhood. PPD did not follow up with Lackey or show her a photograph of Gavin Anderson, at least not in any way that is documented. Nonetheless, Defendant Detective Permint concluded in a report that Lackey "didn't know the deceased."

82.     Detective Permint then either deliberately or recklessly misidentified Lackey's location where she heard the gunshots (which was 2400 Glenwood) as Simmons' work address, which was six blocks farther from the location of the shooting than Lackey actually was. This caused or permitted the police to again conclude another credible witness's report was "unrelated" to Gavin Anderson's murder.

### Police Quickly Confirmed that the Victims Had a History of Violent and Drug-Related Activity, Were Involved With a Notoriously Violent Gang, and Were Involved in Conflict Between Warring Gangs

83.     PPD Detectives involved in the Anderson/Reynolds murder investigation knew that all three victims were associates and/or members of the Jamaican Shower Posse (sometimes referred to herein as the "Posse"), a drug trafficking organization that originated in Kingston, Jamaica, where Otis Reynolds was born. Young Jamaican men came to the U.S. to work as drug sellers and transporters for the Posse, particularly between Texas, Philadelphia, Florida, and New York. In cities where the Posse took hold, record high murder rates followed. In 1988 alone, the federal government linked the Posse to 525 murders. The gang reportedly earned its name because its members, who

typically carried Uzis, were known for "showering" their enemies with bullets. Often the bodies of victims killed by the Posse were left in public places.

84.     In the 1980s, the Posse infiltrated Philadelphia. It successfully established cocaine networks in the West, Southwest, North and Germantown sections of the city, areas that had long been controlled by another drug-trafficking gang, the Junior Black Mafia ("JBM").

85.     Violent confrontations between the Posse and the JBM continued to escalate throughout the late 1980s. Indeed, on September 13, 1989, less than two weeks before the Anderson/Reynolds murders, a PPD Intelligence Memorandum authored by the 12th District Commanding Officer to the Deputy Commissioner of Operations specifically discussed concern regarding the feud between the Posse and the JBM in Philadelphia.

86.     In addition to the victims' association with the Posse, PPD Detectives investigating the Anderson/Reynolds murders knew that the victims were known in the North Philadelphia area as the "stick-up boys." Their nickname originated because they perpetrated violent robberies on drug houses and drug dealers at gunpoint, typically with Uzis, to steal money and drugs. These robberies often ended in shootouts. The "stick-up boys" were also heavily involved in drug trafficking from Texas to New York.

87.     Acquaintances of the victims confirmed their joint involvement in illicit activity. Sherrie Young, whose phone number was found in Gavin Anderson's pocket at the time of his death, told Detectives Santiago and Dougherty that the victims were friends, lived together, and were part of the same criminal enterprise and activities.

88.     Because of the foregoing, PPD treated the Anderson/Reynolds murders as connected.

### Police Identify a Drug Kingpin Known as "Steplight" as the "Prime Suspect" in the Anderson/Reynolds Murders

89.     On September 26, 1989, witnesses immediately confirmed that the Anderson brothers and Reynolds were involved in drug trafficking and brutal robberies in Philadelphia, and told police

that many of the robberies were connected to a well-established North and West Philadelphia drug dealer named "Steplight."

90.     Steplight, aka Noel Grierson, aka Noel Black Jr., was a notorious Philadelphia drug dealer, who owned at least six stores throughout the north and west Philadelphia areas. Steplight has a criminal history including arrests for robbery, possession of drugs, illegal firearms and was a known enemy of the victims. As set forth below, Steplight was engaged in a conflict with them over territory in the months and weeks leading to their deaths.

91.     Reynolds ran a store at 4229 Germantown Avenue which was a front for drugs. Periodically, Reynolds, along with the Anderson brothers, would leave Philadelphia for New York during which Steplight was permitted to run the store. When the Anderson brothers and Reynolds returned after one such trip, Steplight would not give control of the store back.

92.     In the summer of 1989, just months before the murders, Otis Reynolds hired Bruce Williams ("Bruce") to work at the 4229 Germantown Avenue store. Bruce witnessed Steplight and his associates meet with Reynolds and exchange money, which ended in a shootout between the two. Bruce also told police that Steplight owed Reynolds money.

93.     Additionally, during the summer of 1989, Steplight physically assaulted Reynolds and the Anderson brothers and robbed them of a large amount of narcotics.

94.     Furthermore, three weeks before their murders, the Anderson brothers and Reynolds violently robbed Steplight's drug house at 5029 N. 11th Street in Philadelphia (the "5029 N. 11th St. Robbery"). During that robbery, the Anderson brothers and Reynolds threatened occupants with Uzis, and forced them to lie face down on the floor, beat some of them brutally, and fired gunshots into the ceiling as they left with about $3,000 worth of drugs.

95.     On September 27, 1989, the day after the murders, police served a warrant on the 5029 North 11th Street drug house, bringing in thirteen of its occupants to conduct interviews about the

Anderson/Reynolds murders. Six of the occupants told police they had been present during the robbery and identified the Anderson brothers and Reynolds as the assailants.

96.     Occupants additionally informed police of other brutal acts perpetrated by the Anderson brothers and Reynolds. Anthony Elam, one of the robbery victims, told police that he saw Reynolds stab and beat a man at the intersection of Lindley and Windrim Streets, the location of one of Steplight's stores. Miriam Clarke and Darnell Nalley, also robbery victims at 5029 N. 11th St., told police that the Anderson brothers and Reynolds robbed another one of Steplight's stores a week after the 5029 North 11th St. Robbery, and that they had also committed robberies at several locations in Steplight's territory, including 5139 Hutchinson Street, the corners of 11th and Loudon, 15th and Lindley, Lindley and Windrim, and 5049 N. 8th Street, and at 8th and Lindley just two weeks before the 5029 N. 11th St. Robbery.

97.     Sharon Williams, who was pregnant with Gavin Anderson's child at the time of his murder, informed police she had met the Anderson brothers and Reynolds through Steplight. Sharon Williams last saw the Anderson Brothers and Reynolds on Saturday, September 23, 1989, when they were driven to her house in a white 4-door Lincoln with tinted windows. That same day, Sharon Williams ran into Steplight on the street, and he had asked her where Reynolds was.

98.     In addition, the weekend before they were murdered, the Anderson brothers and Reynolds had an altercation with Stefan Nixon, who was supposedly selling bad drugs. When Nixon came out of Steplight's store at 11th and Lindley, the Anderson brothers and Reynolds beat Nixon and began shooting at him. The weekend before that, the Anderson brothers and Reynolds were in a shootout with other young drug dealers near the same location. On that same night, the Anderson brothers and Reynolds got into another shootout with a different 18-year-old.

99.     Because police were aware of the foregoing, on September 27, 1989, Defendant Detective Frank Margerum was requested to check with federal authorities on possible warrants for

Steplight and his associates, including possible indictments that could serve as the basis for an arrest or search warrant.

100.     PPD received further confirmation of the Anderson brothers and Reynolds' involvement in the Jamaican Shower Posse and Junior Black Mafia's war over territory on October 10, 1989, when Anthony Thigpen was arrested. Thigpen told police that he had information about the "three Jamaicans" who were killed in Philadelphia. PPD was alerted and Detective Morton and Lieutenant Durrant traveled to interview him.

101.     Thigpen told police that Emmanuel Mason, a top member of the Junior Black Mafia, visited a Jamaican Shower Posse store on Woodland between 55th and 56th Street to warn the Jamaicans not to sell drugs in that neighborhood unless they got those drugs from the JBM. Disregarding Mason's warning, the Anderson brothers and Reynolds started working protection for the Woodland store and planned a trip to Texas to get drugs to sell back in Philadelphia.

102.     Emmanuel Mason was assaulted in September of 1989, just days before the Anderson brothers and Reynolds were killed.

103.     Anthony Thigpen told PPD Officers that a man named "Q" (aka Derrick Steplight, not to be confused with Noel Grierson, the primary suspect, whose nickname was "Steplight") drove a grey 2-door Lincoln, was recently released from prison, and said he was going to take care of the "Jamaicans." Thigpen told police that the Anderson brothers and Reynolds were killed in retaliation for Mason's beating and because the Anderson brothers and Reynolds had started working as protection for a Jamaican drug store on JBM territory, in defiance of a warning by the JBM. Thigpen told police the Anderson brothers and Reynolds were killed elsewhere and dumped in North Philadelphia. After their bodies were found, Thigpen heard Derrick Steplight say, "We got some of them Jamaicans and we are going to get the rest of them." This new suspect and critical, exculpatory

information was withheld by Defendants throughout the prosecutions of Mr. Williams and was never disclosed until 2019.

104.    Thigpen's tip was given to PPD Officer John Grier, whose confidential informant confirmed "Q" was selling drugs and firearms only two blocks from where JBM warned the Anderson brothers and Reynolds not to sell drugs. This information was never disclosed to Williams.

105.    With knowledge of the Anderson brothers' and Reynolds' involvement with the Jamaican Shower Posse, the PPD convened a multi-unit investigation into the triple homicide, including requesting assistance from the Jamaican Task Force and the Violent Traffickers Task Force, from which a detective was assigned specifically to investigate Noel Grierson, aka Steplight. Police also requested background intelligence from the Violent Traffickers Task Force on several addresses connected to Steplight. The information gathered on Steplight from these task forces has never been disclosed to this day.

106.    On October 18, 1989, police visited Steplight's store on 4933 Old York Road. The employee there at the time, Michael Sultan, claimed the store was owned by someone other than Steplight and that he knew nothing of the Anderson/Reynolds murders.

107.    Detectives then visited Steplight's store at 4229 Germantown Avenue. Employee Raymond Bowen also claimed the store was owned by someone other than Steplight. While there, detectives accidentally knocked over a box behind the counter containing marijuana. They arrested Bowen for possession of drugs and interviewed him, but Bowen denied knowing anything.

108.    On October 21, 1989, police, including PPD Defendants Miller, Witcher, and Rodden, identified Steplight as "the prime suspect" in the Anderson/Reynolds Murders.

109.    On October 22, 1989, police logged extensive research into Steplight's drug houses, known locations, addresses, businesses, criminal history, and associates.

110.     On November 27, 1989, Sharon Williams assisted police by identifying nine associates of Steplight in a "Violent Trafficker's Photo Book" provided by the Violent Traffickers Task Force: Wayne Walker, Clivis Anderson, Marvel Grierson, Clinton Morris, Collimore Easy, Lindan Benschop, Anthony Burante, Patrick Bennett, and David Abraham. Police did not include these identifications in Sharon Williams' interview record.

111.     Collimore "Sherlock" Easy was identified by police as having knowledge of and/or participating in the Anderson/Reynolds murders. Easy was arrested on November 27, 1989, for possession of crack, and was interviewed by Detective Rodden. However, Easy denied knowing Steplight or the victims. In addition, Easy could provide no alibi for the night of the murders. Nonetheless, according to the police reports and activity sheets, law enforcement conducted no further investigation into Easy as a suspect.

112.     Perhaps most shocking of all, despite identifying Steplight as the "prime suspect" in the triple murder as well as the numerous witness statements and informant tips that Steplight was responsible for the murders, Defendant the PPD *never* interviewed Steplight.

113.     Although police visited two stores they knew to be operated by Steplight and conducted interviews with employees, the Commonwealth withheld all records pertaining to one of the employees and, though it disclosed the interview of the other employee, it failed to disclose any mention of Steplight's connection to the store or that employee.

114.     Steplight's status as a "prime suspect" in the Anderson/Reynolds Murders was withheld by police and prosecutors throughout the prosecutions of Mr. Williams and was never disclosed until 2019.

*Police Identify Still Other Suspects for the Anderson/Reynolds Murders*
*Based on Numerous Gunfights in Which the Men Were Involved ,*
*but Do Not Investigate the Alternative Suspects or Disclose Them to Williams*

115.    Witnesses and friends of the Anderson Brothers and Reynolds, such as Joanna Williams, Norma Mercado, and Seanette Honeyblue, told police repeatedly that the Anderson brothers and Reynolds had numerous conflicts with individuals resulting in gunfire, and that at the time of their murders, the three men were afraid for their lives because they thought someone wanted to kill them.

116.    Norma Mercado, Otis Reynolds' then-girlfriend, told police she was walking with Reynolds back from a store when he warned her that if he said, "duck" she had better do so because there were people out there who wanted to kill him because he had robbed them.

117.    Joanna Williams told police that the first night she met Reynolds he told her that he "was in danger, that someone was looking to shoot him" and that three weeks before their deaths, Gavin Anderson came to Joanna Williams' house with a fresh bullet wound in his leg, having been shot. Indeed, whenever a car drove by, the three men would get nervous and uptight because someone wanted them dead.

118.    Seanette Honeyblue, Gavin Anderson's girlfriend, further corroborated that Gavin Anderson had been shot just a few weeks before his murder and that the three men had shot at least three people in recent weeks.

119.    In addition, the week before his murder, Kevin Anderson was seen running from a drug house on Kershaw Street, chased by men accusing him of stealing money.

120.    Police were also told that the Anderson brothers and Reynolds were selling drugs and transporting mass quantities of cocaine and marijuana from other states to be sold in North Philadelphia, an area already dominated by the Jamaican Shower Posse and the JBM, who were, at that time, embroiled in a violent feud with one another over territory.

121.     Indeed, as mentioned above, less than two weeks before the murders, a PPD Intelligence Memorandum authored by the 12th District Commanding Officer to the Deputy Commissioner of Operations addressed the feud between the Jamaican Shower Posse and the Junior Black Mafia in Philadelphia. The memo specifically identified the "Steplight" brothers "Derrick" and "Q" (again, not to be confused with Noel Grierson aka Steplight) as members of the Junior Black Mafia warring with the Jamaican Shower Posse.

122.     A central hub for the Anderson brothers and Reynolds' criminal activity was a Jamaican restaurant called Prime Time. They used the restaurant to traffic drugs from out of state and bring drugs back to Philadelphia. They repeatedly asked women to help them transport drugs across state lines, which often involved such women's employment at Prime Time.

123.     Eglam Anderson, the Anderson brothers' father, told police, including Officers Durrant and Rodden, that he called Prime Time the night of September 25, 1989 to return Kevin Anderson's phone call from earlier that day. A man on the phone told Eglam the boys were upstairs. Eglam also told police Reynolds had robbed a man named Ken, whose brother, Dwight Taylor, was now looking for Reynolds. Likewise, a friend of the Anderson brothers and Reynolds, Donna Steele, also told police that a man named Dwight called her very soon after the Anderson brothers were found by police to inform her of their murders and asked whether the victims had been doing anything that could have caused it. Police never interviewed or questioned Dwight.

124.     Detective Rodden contacted Detective Margerum at the Violent Offenders Traffickers Unit and requested background information on the names provided by Eglam. Detective Rodden also requested any known activities of the Victims in the New York area. This information was never disclosed.

125.     Shortly before their murders, the Anderson brothers and Reynolds had planned a trip to Texas to trade in drugs and arms – even after being warned by the JBM not to. A business card

from a gun shop in Dallas, Texas, was found in Reynolds' personal effects recovered after his death and the ATF later confirmed this shop was, at the time, under joint local-federal investigation.

126.     Further, law enforcement made no record memorializing the chain of custody for Reynolds' personal belongings, which included immigration papers, a Texas identification card, a social security card, several business cards, a phone bill, and a small handwritten phone book. These belongings were ultimately provided to police by Sharon Williams, but how she came to be in possession of these items is not clear.

127.     On September 26, 1989, Sharon Williams told police that a Jamaican man came to her house and informed her that the Anderson brothers and Reynolds were dead. She then ran outside to the corner of 10th and Duncannon, where a woman handed her all of Reynolds' belongings. Sharon Williams went back into her house and called Kevin Anderson's sister, who told Sharon Williams she had spoken to Kevin Anderson on the phone the day before (September 25, 1989) and that day (September 26, 1989).

128.     On October 10, 1989, police interviewed Joyce Gillis, who said she had been introduced to the Anderson brothers and Reynolds by Kevin Hicks. Gillis told police the three men were at her house the day before they were killed and that she found Reynolds' personal effects under her couch. When she saw on television they had been murdered, she gave those belongings to Hicks.

129.     Hicks was a former employee of Steplight and had numerous charges for violent and drug-related crimes. Hicks had close personal ties to Steplight and was one of the last people to be seen with the Anderson brothers and Steplight before they were murdered. Hicks admitted that he met the three through Steplight, and that, at the time, they were working for the Jamaican store at Lindley and Windrim and they were looking for drug sellers. Hicks also admitted that he sold marijuana for the Anderson brothers and Reynolds for a short time.

130.    Police interviewed Hicks, who confirmed Gillis's version of events regarding Reynolds' personal effects and that he gave the effects to his niece, Sharon Williams. Additionally, Hicks told police he had last seen Reynolds and Kevin Anderson at Warnock and Duncannon, at 9:00 p.m. on the Thursday night before Reynolds was found dead (September 25, 1989).

131.    However, Anthony Elam, a victim of the 5029 N. 11th Street robbery, told police that the Anderson brothers and Reynolds robbed everybody but Hicks, who used to work for them as a drug seller. Elam said he last saw Hicks with the three decedents on the day they were killed (September 25, 1989) at 4:00 a.m. The four were standing together at Warnock and Duncannon. This contradicted Hicks' report of having only seen the Victims four days before they were killed, not the day of, but at the same location.

132.    Additionally, a phone bill belonging to the phone number for Hicks was found in Reynolds' personal effects and showed numerous calls to Reynolds' beeper number. No mention of this is found in the police reports. Police disregarded the inconsistent and contradictory stories of Sharon Williams and Hicks as to how Reynolds' belongings ended up in Hicks' possession, and the stories of Hicks and Elam regarding when Hicks may have last seen the Anderson brothers and Reynolds alive.

133.    All credible leads, contradictory evidence, and conflicting witness statements were ignored by police until seven months later, when Hicks' records were requested from the FBI. However, there is no evidence that police deemed Hicks a suspect.

134.    Despite several suspects and leads, police did not arrest or charge anyone with the Anderson/Reynolds Murders for over two years.

135.    As the above shows, not a single lead into the investigation of the Anderson/Reynolds murders indicated that Christopher Williams had anything whatsoever to do with the murders or anyone else who had been affiliated or in conflict with the Anderson brothers and Reynolds. No

evidence connecting Christopher Williams to the Anderson/Reynolds murders existed. Mr. Williams' name was never mentioned by any witness or by police, and Williams was never interviewed as a suspect or person of interest.

### D. The Murder of Michael Haynesworth on November 21, 1989

136.     On November 21, 1989, Michael Haynesworth, a 19-year-old black man, was found shot to death in the back seat of his own car.

*Investigation into Haynesworth's Murder Immediately Implicates James White*

137.     Investigation following the Haynesworth murder immediately identified Rashida Salaam, a 13-year-old girl, as the person Haynesworth was supposed to be with on the night of his murder. Ms. Salaam and Mr. Haynesworth had a prior relationship. Ms. Salaam also happened to be the then-girlfriend of a 19-year-old man names James White. Mr. White would become the linchpin the false case against Christopher Williams and others.

138.     Detectives interviewed Ms. Salaam on November 22, 1989, the day after Mr. Haynesworth's body was found.

139.     In the statement for Ms. Salaam taken by Defendant Detective Charles Bentham, Ms. Salaam identified "Saleem" (later identified as Troy Coulston) as the one who murdered Michael Haynesworth. Ms. Salaam did not identify Christopher Williams in any fashion before signing her statement as true and accurate. Then, after the 13-year-old Salaam had provided her statement and signed the truth of it, Detective Bentham asked her whether there was "anything else" she wished to "add" to her statement. For the first time, Ms. Salaam responded that "Chris" was actually the one "who set it all up." This is the first time Chris Williams was identified in relation to the Haynesworth murder, or any murder for that matter. An addendum to the interview, provided by Detective Richard Lynn, states that "James Robertson"—aka James White—went into the car with Saleem and Haynesworth before Haynesworth was murdered, and that Chris Williams followed them in his car.

140.    Multiple witnesses had further implicated James White in Mr. Haynesworth's murder due to the fact that White was Rashida Salaam's boyfriend and was upset Haynesworth was "messing with" Ms. Salaam. In fact, James White confessed to Haynesworth's murder to a man named Richard Johnson. But when Mr. Johnson responded distraughtly by telling White that Haynesworth was Johnson's cousin, White immediately pivoted and blamed "Chris and Saleem."

### PPD Arrests James White for the Haynesworth Murder

141.    On December 9, 1989, James White was arrested for the murder of Michael Haynesworth and gave his first of multiple statements to police and prosecutors relevant to Christopher Williams. In turn, White was soon charged with murder of Marron Genrette. White provided this statement as part of a deal he had worked out with ADA Desiderio shortly after his arrest which required White to plead guilty to the murders of Haynesworth and Genrette and identify anyone who participated in the crimes. In return, White was to receive two consecutive prison sentence of 5 to 10 years for a total of 10 to 20 years.

142.    As such, ADA Desiderio was involved in the earliest moments of the investigation of the murders for which Christopher Williams would later be arrested and charged, working to develop statements from White, Salaam, and others that would be used to establish probable cause to arrest Mr. Williams. In accordance with the agreement White worked out with Desiderio, White made numerous, albeit contradictory, statements implicating himself and others in several murders.

143.    Specifically, in the December 9, 1989, statement from White, White implicated Chris Williams, Troy Coulston, and Rashida Salaam in Mr. Haynesworth's murder. White's statement was false (something he would later admit in a revised statement after further working with ADA Desiderio). In his statement, White alluded to other crimes that Williams and Coulston also allegedly committed. ADA Desiderio and PPD fed much of this information to White with the purpose of fabricating a case against Christopher Williams and others.

144.     On December 9, 1989, shortly after White's arrest and statement in conjunction with the Haynesworth murder, Detective Manuel Santiago interviewed Alton Harvey, with whom James White had been living and who owned the property where supposedly Haynesworth had come prior to being murdered. Mr. Harvey stated that he knew nothing about the murder and did not know "Chris" or "Saleem." Then, as with Ms. Salaam's interview discussed above, Mr. Harvey's interview abruptly changed course. According to the record of the statement, Detective Santiago then abruptly asked Mr. Harvey, "Can you now remember information about the murder of Michael Haynesworth?" Mr. Harvey then claimed that James White told him that White murdered Haynesworth along with Christopher Williams and Rashida Salaam. On information and belief, ADA Desiderio, who had already been working with James White and with detectives who were working with James White, was involved in Alton Harvey's fabrication of this statement.

145.     On December 16, 1989, Chris Williams was arrested for the first time and brought in for questioning related to the Haynesworth murder. Mr. Williams had no information regarding the murder because he had nothing to do with the murder. Police released him the same day.

146.     Abrupt changes in witness's testimony continued to occur in the subsequent months to implicate Williams in murders. On May 4, 1990, Terrence Smith, who was himself implicated in the Genrette murder and who had, less than a year earlier on July 5, 1989, identified Anthony Davis as Genrette's murderer to Detectives Richard Harris and Raleigh Witcher, abruptly changed his statement and claimed to Detective Farabelli that Christopher Williams was involved in Genrette's murder along with Troy Coulston.

147.     On information and belief, ADA Desiderio was instrumental along with detectives in feeding information to these witnesses and having them fabricate Chris Williams' involvement in the Genrette murder.

148.     Thereafter on May 28, 1990, Christopher Williams was arrested for the Genrette murder.

149.     Nine months later on February 28, 1991 – over 15 months after White's initial statement in the Haynesworth case relating to Williams – Christopher Williams was charged with the Haynesworth murder and arrested a week later for that murder on March 6, 1991.

### Defendants Continued to Coerce James White and Used Him to Fabricate a Series of False Statements Implicating Williams and Others

150.     Thereafter, ADA Desiderio and PPD Detectives continued to use James White to fabricate a case against Christopher Williams and others in relation to the six murders. White presented an ever-changing array of statements. White repeatedly had to state that his prior statement was false and provide new statements to fit details fed to him by ADA Desiderio and PPD.

151.     On May 3, 1991, *over 15 months* after his first statement relating to the Haynesworth murder, James White gave four more statements—a new statement related to the Haynesworth murder, two related to the Graham murder, and another related to the Genrette murder—based on the aforementioned agreement reached between White, his attorney (Gerald Stein), and ADA Desiderio. All of those statements implicated Williams, among others, in each of the murders. They were all lies fabricated at the behest of ADA Desiderio and PPD, as White would later publicly admit.

152.     Specifically, on May 3, 1991, at or around 10:50 a.m., James White gave a new statement to Detectives Hasara and Harris with respect to the Haynesworth murder. Therein, he stated that the first statement he gave regarding the Haynesworth murder was false. White proceeded to add several details absent from his prior statement on the murder. He claimed that Christopher Williams reached out to White because he (Williams) allegedly wanted to stick-up a drug dealer named David Perez, but that White could not facilitate the stick-up. White claimed that, consequently, he had his girlfriend, Rashida Salaam, lure Haynesworth to her home and that upon arrival, Troy Coulston hit Haynesworth in the face with the metal part of a hammer and continued to hit Haynesworth five times

28

in the head with the wooden part of the hammer. None of these details were supported by the physical evidence which showed no commensurate injuries to Haynesworth's face or head. ADA Desiderio and Detectives Joseph Hasara and Richard Harris knew it. Further, White conveniently claimed that Coulston and Williams were talking to each other during the Haynesworth murder about "who was more ruthless" and that Williams mentioned shooting a "cab driver" (which was likely his entrée into discussing William Graham) and that Coulston talked about someone he had shot with a shotgun (which was likely his entrée into discussing Marron Genrette). Still further, White now provided details that Coulston shot Haynesworth in the vehicle twice and then went back to shoot him twice more in the vehicle. Finally, White claimed that, after shooting Haynesworth, Coulston asked Williams, "How many does that make? 24?," as apparently an indication 24 murders had been committed by Coulston or between Coulston and Williams. The notion was preposterous, and Desiderio and Detectives knew it but nonetheless fed White details to manufacture a case against Williams and others.

153.    Shortly thereafter the same day, on May 3, 1991, James White gave a statement to Detective Joseph Hasara relating to the murder of cab driver William Graham. Therein, White claimed that he (White) was with Chris Williams when Williams shot and killed William Graham in his cab. White claimed Chris Williams shot Mr. Graham so that Williams could use the cab to drive around and rob people with M16s without worrying about police stopping them.

154.    Undoubtedly ADA Desiderio recognized that, among other issues, a major problem with White's first statement as to the William Graham murder was that the cab was not stolen; Graham was found dead in the cab. Accordingly, later that day, pursuant to his agreement with Desiderio, James White gave another statement about the Graham murder. This time, additional details flowed out of White, including when, at the very end of the interview, he recalled that the cab didn't start when Williams tried to start it.

155.    As part of his ongoing plea deal with ADA Desiderio, White was given immunity from prosecution in the Graham case and was never arrested or charged for his part in it.

156.    Again that same day, on May 3, 1991, at or around 2:15 p.m., pursuant to the same agreement with ADA Desiderio, James White provided a statement to Detectives Richard Harris and Joseph Hasara related to the Genrette murder. Therein, White implicated Christopher Williams in Genrette's murder, claiming that Williams assisted Troy Coulston, who White claimed actually shot Genrette. White claimed that he (White) and Terrence Smith were interested in robbing David Perez, a drug dealer for whom Genrette worked. White claimed he went to Rick Bennett's house to inform him, who in turn brought his half-brother, Christopher Williams, into the fold. White continued by telling an absurd, Hollywood-like story wherein when White met Williams, Williams pulled out all kinds of firearms and began polishing them and their bullets. He further claimed that during the Haynesworth murder, Troy Coulston bragged about being a "bad mother" with a shotgun and that he "killed a boy on the boulevard." White claimed that he asked Coulston if he killed Marron Genrette and Coulston said "yes." On information and belief, ADA Desiderio and detectives fed James White details to incorporate into a fabricated story to implicate Williams in the Genrette murder.

157.    ADA Desiderio also questioned White about the Anderson/Reynolds murders, but White told him he knew nothing about them.

158.    On May 16, 1991, Christopher Williams was arraigned for the murder of Michael Haynesworth.

159.    Over four months later, on September 30, 1991, Craig Vaughn – a government informant who had previously worked for the DA's Office and also happened to be an inmate in White's prison – contacted ADA Desiderio stating that White told Vaughn about his plea deal for the Genrette and Haynesworth murders, and that White later confessed to Vaughn that he was also involved in a triple homicide of three Jamaicans that White did not disclose to ADA Desiderio.

160.    White never said these things to Vaughn. Instead, White actually told Vaughn that ADA Desiderio and PPD detectives asked White to "jog his memory" as to whether Christopher Williams was involved in the Anderson/Reynolds murders, but that White told police he had no knowledge of these crimes. Vaughn's lie about White to ADA Desiderio suggests that Desiderio used Vaughn – an informant who had already worked with the DA's Office and who requested special favor in exchange for his testifying to White's statement about the triple murder – as a way to coerce White to implicate Williams in the Anderson/Reynolds murder.

161.    Indeed, based solely on Vaughn's statement to ADA Desiderio, Desiderio rescinded White's plea agreement for the previous murders and additionally charged White with the Anderson/Reynolds murders.

162.    White was not informed of the cancellation of his plea deal until after White was charged in prison with the Anderson/Reynolds murders by Detective Ansel. White and Desiderio spoke on the phone after White's arrest, *without* White's attorney. On that call, ADA Desiderio informed White that there was no longer any plea deal for White's previous crimes and that White had only one choice: to plead guilty to the Anderson/Reynolds murders. White again told Desiderio that he did not commit and had no involvement in the Anderson/Reynolds murders. In response, ADA Desiderio threatened to charge White will all six murders, use White's previously made incriminating statements against him (including those for which he had immunity), and to seek the death penalty for White.

163.    White was transported from the jail to the Philadelphia Police Department for questioning. Detective Ansel attempted to interrogate White in the police car, but White continued to tell detectives he did not commit the Anderson/Reynolds murders for which he was now arrested. Additionally, after White was charged with the Anderson/Reynolds murders, he was transported to the District Attorney's Office numerous times to speak with ADA Desiderio about a new plea deal.

Detective Harris and other PPD Detectives were present at those meetings and helped to knowingly coerce false testimony from White.

164.     ADA Desiderio, without White's attorney present, then coerced White into making a new plea deal: White would plead guilty to all six murders in return for his testimony against Williams – and others whom White said were involved – and in return White would receive a life sentence. However, Desiderio made a separate promise to White in conjunction: Desiderio promised White that although the plea agreement called for life in prison, White would receive a pardon after he served 15 years because Desiderio would guarantee a hearing and put a letter in White's prison file to be seen by the Pardon Board. Desiderio and White met – with and without White's attorney present – in connection with this plea agreement. In fact, Desiderio arranged for White's mother and other family members to be present at some of these meetings and to eat together while discussing White's deal. Also in these meetings and prior to any trial, Desiderio instructed White not to reveal that Desiderio promised White he would be pardoned after 15 years, which was not memorialized in the plea agreement, in order, as Desiderio characterized it to White, "to protect the integrity of the deal" at trial.

165.     White and White's mother testified as to this secret deal with Desiderio. Moreover, this off-the-books deal is supported by contemporaneous correspondence from White's attorney (Gerald Stein). White and his mother have further testified about favors Desiderio paid White in conjunction with obtaining his false testimony, including allowing White to see his mother, arranging for meals, and other special treatment.

166.     Furthermore, Detective Richard Harris, who personally knew and went to high school with White's mother, Sheryl Richardson, gave White advice relating to the plea deal, telling him to take it, and to file for an application of pardon in 12 years, not 15.

167.    Because of ADA Desiderio's threats of the death penalty and promises of an early release along with the other favors Desiderio paid to White, White agreed to lie. Desiderio, along with PPD Detectives, then fed White descriptions of the Anderson brothers and Reynolds and the murders, showing White photographs of the crime scene and the victims' body positions at the time of death, so that White could identify them. Although Desiderio knew White was not involved in the Anderson/Reynolds murders, Desiderio told White that he needed him to come up with a plausible story for the murders if he wanted to keep the new plea deal. When White reminded Desiderio he did not know how the murders occurred, Desiderio concocted a confession based off White's statement in the Haynesworth case, explaining to White that he must implicate himself as well or no one would believe White's testimony.

168.    After White and Desiderio fabricated how the murders took place, White gave his first formal statement about the Anderson/Reynolds' murders on November 4, 1991 at 11:58 a.m., to Detectives Cimino and Ansel. There, White repeated the fabricated confession, implicating himself and Williams – as he had done three times before – and also named Rick Bennett, "Steve," "Binky," and "Opie" as those involved in the Anderson/Reynolds murders that had allegedly occurred *over two years prior*.

169.    White claimed that Christopher Williams came to White's mother's house with Rick Bennett and said that he (Williams) needed a van. White claimed that he stole a dark blue van near Temple University for Williams. According to White, Williams then proceeded to discuss sticking-up three men whom they would lure under the pretense of selling them guns. According to White, "Binky" (later identified as Theophalis Wilson) would bring the three men by. White then claimed that Wilson brought the three men over and Williams put guns to their face and forced them to the floor. Then, according to White, Williams left with one of the accosted men, along with Rick Bennett and "Steve," and when they returned with $24,000, Bennett claimed that he killed the man. Then, White

claimed that Williams demanded more money from the other two victims and forced them into the van in which White was present. White said the others, "Opie," "Binky" and Steve" were driving in another car as backup. When the victims denied having more money, Williams shot the smaller victim two or three times in the face and threw him from the back of the moving vehicle onto the street. When the last victim would not give up the money, White said, Williams shot him twice, and threw him out of the van as well. White did not know where the bodies were thrown other than that they were thrown in "North Philly."

170.    PPD never recovered the van White allegedly stole and in which the Anderson brothers and Reynolds were allegedly shot. PPD also never recovered any murder weapon.

171.    After White provided the false statement on the Anderson/Reynolds murders, Desiderio and PPD continued to have White provide statements as to the other murders. Indeed, later that day, on November 4, 1991, at 2:10 p.m., Detective Cimino again interviewed White in relation to the Graham murder. White admitted that his prior statement on the murder was false. This time, White said that Rick Bennett murdered the cab driver, not Christopher Williams. White claimed, however, that the murder was Williams' idea and that Mr. Williams ordered him and Bennett to commit the murder, that Chris Williams was the "leader of the group," and that White was "afraid" of Williams. White explained his prior lie: "Because I did not want Rick to get locked up and implicate me in other jobs, he could have implicated me in other cases I since have been arrested for." Desiderio had once again forced a fabrication through James White to implicate Christopher Williams in a murder.

172.    That same day, on November 4, 1991, James White entered into a Memorandum of Agreement with the District Attorney's Office.

173.    But White was not done changing his stories. Just three days later, on November 7, 1991, ADA Desiderio and the PPD spoke to White again and, yet again, he changed his statement

relating to the Graham murder. On November 13, 1991, Detectives Cimino and Ansel took White's new statement, this time admitting that he (White) and a man named James MacArthur killed Mr. Graham. Despite his repeated and admitted dishonesty across multiple murders, ADA Desiderio and detectives continued to spur him to implicate Williams without any corroborating evidence. This time White's story was that the murder of William Graham was prompted by Chris Williams telling him that he would have to kill someone he didn't know (no longer because Williams wanted a cab to drive around and rob people). Again, ADA Desiderio and Detectives strained to have their 19-year-old admitted murderer and liar put Williams into the story.

174.    Then later in the afternoon of November 13, 1991, at 3:45 p.m., White was interviewed again, this time by Detective Ansel. White was apparently questioned about twenty-one photographs. During that interview, White allegedly identified a photo of Theophalis Wilson as "Binky" and Joseph Lee as "Opie" – participants in the Anderson/Reynolds murders according to White's fabricated statement as discussed above. This was the first time that Theophalis Wilson was identified by White, and the first and only time Wilson's name was connected with the Anderson/Reynolds Murders. This is further in a pattern of ADA Desiderio and PPD building the story as they wanted it, rather than as it truly was, in service of convictions at any cost.

175.    On November 14, 1991, James White entered his negotiated guilty plea to the six murders. In exchange for White's cooperation, the Commonwealth did not pursue the death penalty against him, and White was instead sentenced to six concurrent life sentences for six homicides. Moreover, as detailed above along with other inducements, White was promised early release by ADA Desiderio, though he told White not to mention it to protect the "integrity of the deal."

*ADA Desiderio Attempts to Coerce Theophalis Wilson into Testifying Against Williams*

176.    As they did with James White, ADA Desiderio and PPD Detectives attempted to make a deal with Theophalis Wilson (Binky) by coercing him to falsely testify against Christopher Williams.

177.    On December 19, 1991, police requested that Wilson voluntarily come to the PPD's Homicide Unit to speak with PPD Detectives about the murders White had previously confessed to. Wilson did so, and once there, PPD told Wilson that they only wanted Christopher Williams for the murders and that if Wilson cooperated, he would not be charged with any crimes. Wilson refused to implicate Williams, stating he had no knowledge of any of the murders and could not testify falsely. Afterward, police took Wilson home.

178.    The next day, Wilson's presence was again requested, this time at the DA's Office. There, and in the presence of Detective Cimino, ADA Desiderio threatened Wilson with prosecution if he did not implicate Williams in the crimes White had already confessed to. Wilson was also informed that White had implicated Wilson in the Anderson/Reynolds murders. Regardless, Wilson told Desiderio and police that he did not know White, and that he had no knowledge of the Anderson/Reynolds murders. ADA Desiderio told Wilson he knew Wilson did not commit those crimes, but that he would nonetheless be prosecuted if he did not cooperate. After this encounter Wilson again went home.

179.    Although White had implicated Williams in the Anderson/Reynolds murders in November of 1991, and no further evidence was discovered, Williams was not arrested for these murders until March 1992. Similarly, Wilson was not arrested until February 1992 for the Anderson/Reynolds murders.

### *Lynne Abraham and David Webb Approve Seeking the Death Penalty Against Williams*

180.    On December 27, 1991, ADA Desiderio wrote a memorandum to ADA David Webb, Chief of Homicide in the Philadelphia DA's Office, requesting that Desiderio be able to pursue the death penalty against Christopher Williams. This memorandum was in turn forwarded to DA Lynne Abraham.

181.    On information and belief, approval from both Abraham and Webb was required to pursue the death penalty against Williams and both approved.

**II. <u>The Trials</u>**

182.    In December 1991, Williams went to trial and was acquitted of the Genrette murder.

183.    From January 14 – 23, 1992, Mr. Williams proceeded to a jury trial on the Haynesworth murder, along with co-defendant Troy Coulston. ADA Desiderio relied primarily on the testimony of James White to prove the case against Mr. Williams at trial. During questioning by ADA Desiderio, White falsely testified, at Desiderio's insistence, that White expected to spend the rest of his life in prison. On January 23, 1992, the jury convicted Mr. Williams (and Coulston) of first-degree murder and related offenses. Williams was sentenced to life in prison without parole (as was Coulston).

184.    On March 11, 1992, Williams was arrested for the murder of William Graham.

185.    Also on March 11, 1992, Williams was arrested for the murders of Kevin Anderson, Gavin Anderson, and Otis Reynolds.

186.    On April 13, 1992, Williams was charged with the murders of Kevin Anderson, Gavin Anderson, and Otis Reynolds.

187.    On July 19, 1993, Mr. Williams went to trial on the Anderson/Reynolds murders along with co-defendants Theophalis Wilson and Rick Bennett. Williams and Bennett were simultaneously tried for the Graham murder as well.

188.    At trial, White testified against Williams, Bennett, and Wilson, admitting that he killed – and pleaded guilty to killing – six people within a ten-month timeframe: William Graham in February 1989, Marron Genrette in June 1989, Gavin Anderson, Kevin Anderson, and Otis Reynolds in September of 1989, and Michael Haynesworth in November of 1989.

189.    Although White pleaded guilty to these murders, he admitted to lying in multiple statements and receiving a plea deal from the District Attorney's Office regardless of his

inconsistencies. However, Desiderio coached White to lie to the jury, by having White testify that he intended to spend life in prison for his crimes, when Desiderio had actually promised White he would be pardoned in 15 years in exchange for his testimony against the Williams, Bennet and Wilson. This perjury was never corrected or brought to the attention of the court or the defense by Desiderio.

190.     Defendant Detectives Schol, Miller, and Rodden testified to finding the three victims in the early morning hours of September 26, 1989 and described the three victims' crime scenes.

191.     White failed to disclose, and ADA Desiderio failed to elicit details regarding White's meetings with ADA Desiderio, Desiderio's threats to White, or the promise that White would be released early – a condition not reflected in White's plea agreement. At no time during trial did White, ADA Desiderio, or the police officers disclose that White's testimony was fabricated and false.

192.     On cross-examination, Dr. Paul Hoyer, one of the medical examiners, established there were no scrapes or bruises on Reynolds or Gavin Anderson, while Dr. Hygow Park, testified that there were no injuries other than gunshot wounds on Kevin Anderson.

193.     Dr. Hoyer also testified that whether a person would sustain additional injuries, such as scrapes, bruises, abrasions, or contusions from a fall after a shooting would depend on the surface upon which the person fell, the speed of travel and whether the surface was wet or dry. The absence of such injuries in the victims, he said, meant only that the body "did not fall against a hard surface with a lot of force."

194.     David Lee, a federal informant, also testified for the prosecution that he had been a straw purchaser of weapons for Christopher Williams. He further testified that he bought nine-millimeter guns for Wilson in 1990, almost a year after the Anderson/Reynolds Murders took place. Then, Lee swore he had no guarantee of lenient treatment for his testimony and that he had no agreement with Desiderio, the prosecutor.

195.    In addition, Alan Jackson testified regarding the bullet fragments taken from Kevin Anderson and Otis Reynolds were consistent with a nine-millimeter gun, but that two different types of guns were used to fire the various bullets.

196.    On August 6, 1993, the jury convicted Christopher Williams and Theophalis Wilson of all three homicides in the Anderson/Reynolds case. Rick Bennett was acquitted. Mr. Williams was sentenced to death and Mr. Wilson, a 17-year-old at the time, to life in prison. Mr. Williams and Mr. Bennett were acquitted of the Graham murder. Mr. Bennett was convicted only of a Corrupt Organizations offense in the Graham case and sentenced to 11 ½ to 23 months incarceration.

197.    On September 13, 1993, after testifying against Williams and Wilson, White pleaded guilty to all six murders – Haynesworth, Genrette, Graham, and the Anderson/Reynolds murders.

### III. **Appeals and Post-Conviction**

198.    In 2011, James White filed a petition seeking to overturn his convictions. In an affidavit, White asserted that his testimony against Williams and Wilson was false as to the Anderson/Reynolds murders.

199.    In 2013, Christopher Williams was granted a new trial in the Anderson/Reynolds case following an evidentiary hearing during which White testified that his trial testimony was a lie—he knew nothing about the triple homicide, which he had repeatedly told Desiderio before Desiderio threatened him with a death sentence unless he testified otherwise. White testified that he agreed only to testify against Williams and Wilson after Desiderio promised him to advocate for his release after 15 years.

200.    White further denied stealing the van allegedly involved in the crime, which he gave inconsistent accounts of to police, and testified that police never even questioned him about the details of how or when he allegedly stole it.

201.    White testified that in 2005 he realized Desiderio was not going to provide assistance in getting his sentence and conviction commuted or pardoned after he had served 15 years, as Desiderio had promised. White learned that an Assistant District Attorney like Desiderio has no influence over the parole or pardon board. White also discovered that Desiderio lied to him about Desiderio's "promise" to attend a guaranteed hearing for White's pardon in exchange for White's testimony against Williams and Wilson, as an ADA representative is required to be at the hearing. Additionally, White learned that although Desiderio threatened to use White's previous statements against him when seeking the death penalty, prior statements made in relation to a plea deal cannot be used against someone in connection with those charges.

202.    When White learned that Desiderio's threats – the reason White testified falsely – were empty and worthless, White filed for post-conviction relief alleging his innocence in the Anderson/Reynolds murders to which he had pleaded guilty and stating that his guilty pleas were based on an unconstitutional deal with Desiderio.

203.    White further testified that police officers and prosecutors knew that he had no knowledge of or involvement in the Anderson/Reynolds murders *before* he made his statement regarding the crimes. When White informed Desiderio that he did not know who committed the murders, Desiderio told White to lie and to use to the same concepts from the Haynesworth case in his statement about the Anderson/Reynolds murders so the story would be convincing.

204.    Supporting White's recantation, Robert Tressell, chief criminal investigator for the Cobb County, Georgia District Attorney's Office and an expert in blood pattern and spatter analysis, testified that the location of Gavin Anderson's body was inconsistent with being pushed from a moving van. The blood evidence was also inconsistent with White's description. Blood had pooled in the creases of Anderson's ear and had the body been thrown, there would have been evidence of blood projection away from the ear. Tressell also testified that Kevin Anderson's clothing showed that

blood had begun to soak in and the blood flow patterns were consistent with being shot and falling right in the place where he was found.

205.    Tressell also noted that the bullet removed from Kevin Anderson's body did not match the nine-millimeter gun seized from Williams.

206.    Likewise, Dr. Charles Wetli, former chief medical examiner for Suffolk County, New York, testified that based on a review of the autopsy, the trial transcripts and the crime scene reports, there was no evidence that any of the victims were thrown from a moving vehicle. He also said there was no evidence that any of the Victims were shot directly in the face as White claimed.

207.    On December 30, 2013, Court of Common Pleas Judge William Manfredi granted Williams a new trial due to ineffective assistance of counsel, because William's trial attorney, Lee Mandell, failed to retain a medical expert to confront the prosecution's evidence, and failed to cross-examine the prosecution's medical examiners to draw out the inconsistencies in the evidence. The prosecution appealed. In July 2016, the Pennsylvania Supreme Court upheld William's new trial ruling.

208.    Mr. Williams began to see the light at the end of the tunnel when the Conviction Integrity Unit of the Philadelphia District Attorney's Office ("CIU") began to look at his convictions. Founded in 2018 upon the election of Philadelphia District Attorney Larry Krasner, the CIU "investigates and reviews convicted offenders' legitimate claims of innocence and wrongful conviction."

209.    In May 2018, the CIU began its review of the conviction of Theophalis Wilson in the Anderson/Reynolds murders. The review prompted the CIU to decide it needed to review Christopher Williams' conviction for the triple homicide as well.

210.    On March 20, 2019, the CIU provided Mr. Williams' counsel at the Philadelphia Defenders' Association with a copy of the District Attorney's Office (DAO) file, containing over 40,000 pages of material *not previously produced*, which showed in many ways how Mr. Williams'

constitutional rights were trampled by ADA Desiderio and the PPD. The file revealed that withheld from Williams was the evidence discussed at length above, including among other things that:

a. There were multiple possible other suspects for the Anderson/Reynolds Murders and the Anderson brothers and Reynolds were caught in an ongoing dispute between the Posse and JBM.

b. The Anderson brothers and Reynolds had been running a drug operation in Philadelphia that had been taken from their control by Noel Grierson aka Steplight. An undisclosed police activity sheet had identified Steplight as "prime suspect" in the triple homicide. Further undisclosed information and reports show the extensive police investigation of Steplight (who was never charged), including searches of the state department of motor vehicles, property record searches, criminal history searches, and a memo detailing the location of several businesses affiliated with Steplight.

c. Undisclosed reports suggesting that a member of the JBM claimed responsibility for killing Reynolds and the Anderson brothers because they had started providing protection for a Jamaican narcotics operation located in territory controlled by the Junior Black Mafia.

d. Multiple witness statements contradicting the manner and timing of the three men's murders as told by James White.

e. Reports showing that David Lee, who said he sold guns to Williams, had previously provided prosecution testimony in two murders, one of which he had a role in and had not been prosecuted. This cast doubt on Lee's claims at trial that he was "squeaky clean" and feared possible prison time for buying guns for

Williams. One of those prior prosecutions involving Lee was handled by ADA Desiderio, who hid this information from Williams' defense team.

f.   Multiple reports and notes of correspondence between ADA Desiderio and White, and ADA Desiderio and White's mother, suggesting that the prosecutor would help White get released early.

g.   A note from Desiderio to himself in the file states: "Key points: . . . Get Morgue Photos of Jamaicans. Show to White to alleviate I.D. problem."

211.   Mr. Williams was subsequently granted a new trial in the Anderson/Reynolds murders due to these severe constitutional violations and miscarriages of justice. In turn, on December 18, 2019, the CIU filed a Motion for Nolle Prosequi Pursuant to Pa. R. Crim. P. 585(a), asserting that Mr. Williams should not, and could not, be retried for the Anderson/Reynolds murders. The CIU specifically conceded that James White was not a credible witness, ADA Desiderio and others had committed numerous egregious *Brady/Giglio* violations, and after taking all that into consideration, the Commonwealth could not prove that Mr. Williams committed the murders. On December 23, 2019, the *nolle prosequi* motion was granted as to all charges against Mr. Williams for the triple murder.

212.   The Commonwealth has characterized the evidence used to convict Mr. Williams of the triple homicide as "apparently suppressed and false[.]"

213.   On January 13, 2020, the CIU and Theophalis Wilson's defense counsel stipulated in relevant part that James White's testimony during the Anderson/Reynolds Murder trial was not credible, the Commonwealth withheld *Brady/Giglio* evidence regarding David Lee's involvement in other murders, and Theophalis Wilson was likely innocent. On January 21, 2020, the court granted the Commonwealth's motion to nolle prose Wilson's convictions.

43

214.    Mr. Williams remained in prison, however, due to his conviction for the murder of Michael Haynesworth, which was built on the same faulty evidence that resulted in his convictions for the Anderson/Reynolds murders.

215.    On March 9, 2020, Mr. Williams filed a PCRA Petition and requested that the CIU review his conviction in the Haynesworth case.

216.    Fortunately, the CIU investigated the Haynesworth case as well and, in doing so, discovered new evidence and/or evidence of *Brady* and *Napue* violations that was in the possession of the Commonwealth at the time of trial. Some of that evidence was found in the District Attorney's file while some of the evidence was in the possession of the PPD.

217.    The Commonwealth conceded that "the record establishes that [Mr. Williams'] constitutional rights have been violated" and that his criminal trial was "fundamentally unfair[.]"

218.    Further, the CIU admitted that:

a.    Evidence withheld with respect to David Lee's involvement in two homicides was suppressed until Williams received the DAO file on March 9, 2020. Moreover, as stated above, ADA Desiderio had also prosecuted at least one of the murders for which David Lee was the main witness and Desiderio nonetheless allowed Lee to testify at the Haynesworth murder trial that he had never met Desiderio.

b.    The suppression of the information pertaining to David Lee "continued long after" Williams was convicted of Haynesworth's murder. In fact, during the discovery process in Williams' retrial for the Anderson/Reynolds murders, two other trial prosecutors refused to provide the discovery pertaining to David Lee, informing both Williams' counsel and the court that after they each personally went through each one of the trial boxes, they determined that Lee was "not at all involved" in one of the homicides and was merely a witness in another. Together

44

both trial prosecutors not only continued to suppress the information that should have been disclosed at the time Williams was prosecuted decades earlier, but they also affirmatively obscured the fact that Lee implicated himself as a participant in both murders.

c. "[T]hese repeated failures to provide the information [pertaining to David Lee] combined with the affirmative misrepresentations appear to suggest *more* than just a negligent failure to disclosure *Brady* information." (Emphasis added.) In addition to Lee's role in other homicides, there is additional impeaching evidence that is now available for Lee: law enforcement confiscated a firearm from Lee in 1981. And around July 1990, after an ATF investigation into Lee for federal firearms violations stemming from straw gun purchases in the Philadelphia and Washington, DC areas, Lee became a federal informant. It appears likely that the trial prosecutor [ADA Desiderio] was aware of this investigation and had any and all statements related to this investigation sealed before the Haynesworth trial so all of this information was suppressed at the time of trial and Williams learned of it only when his current PCRA counsel was provided access to the DAO file in 2019."

d. "There was a reasonable probability that the suppressed [Lee] evidence would have changed the outcome of Williams' trial. Lee was one of three Commonwealth witnesses in the case. His function at trial was to link Williams to a 9 mm gun and a request for hand grenades. His testimony bolstered [James] White and Rashida [Salaam]'s often inconsistent and evolving claims and generally cast Williams as a dangerous character who secured multiple weapons through straw purchases."

e.   Despite Lee knowing he would face no charges if he fully cooperated with the prosecution, the trial prosecutor at the Haynesworth trial (Desiderio) intentionally elicited testimony from Lee that detectives promised Lee "[would] get locked up" and that he had no promises from the prosecutor.

f.   "Finally, the trial prosecutor's failure to correct Lee's mischaracterization of their 'new' relationship further compounded this issue – had the jury known that Lee had cooperated with the very same trial prosecutor in a prior homicide case, the jury may have easily discredited other aspects of his testimony and instead credited the defense's arguments….."

219.   In the Commonwealth's February 6, 2021, Answer to Mr. Williams' PCRA Petition on the Haynesworth case, the Commonwealth summarized Mr. Williams' conviction honestly and aptly:

> Put in the simplest of terms, Williams' conviction was built on a house of cards that began to collapse in 2019 when the Commonwealth opened up its files to the defense. Once the light was allowed to shine, the Commonwealth was forced to see that the basic structure underpinning the conviction was built on the unscrupulous behavior of several bad actors.

220.   The CIU, in a joint motion to vacate and dismiss the charges in the Haynesworth case, stated: "After a thorough investigation, the [defense and prosecution agree] that White's testimony is not credible in this case, because White has repeatedly falsely implicated Williams in other homicides, White's narrative of the Haynesworth crime is inconsistent with the available physical evidence, and White has provided multiple inconsistent accounts of the crime to other witnesses."

a.   For example, White said Coulston and Williams kicked Haynesworth in the abdomen, and that Coulston struck Haynesworth with a hammer in his face and head, and walked on his head. However, the autopsy report for Haynesworth showed that Haynesworth's scalp, horsehead, face, neck, trunk and extremities show no evidence of other injuries.

b.  White claimed that Haynesworth's hands were bound behind his back, but crime scene photos showed his hands were tied in front of him.

c.  White claimed that binding on Haynesworth's feet was loose enough for him to walk to his car. However, police testified that his feet were tightly bound together.

d.  White said Haynesworth was shot while in the back seat of the car. However, the medical examiner's report said that dried grass was found on Haynesworth's face, left wrist, left sleeve, and left pant leg—suggesting he was shot while on the ground and then placed in his car.

221.    In the same joint motion, the CIU conceded that Lee was also an unreliable witness. During questioning by Desiderio, Lee falsely testified that he had only met with Desiderio a week prior to trial. Desiderio did not correct that testimony. In addition, as discussed above, ADA Desiderio failed to disclose that Lee was involved in other murders, that he was the subject of a federal investigation for federal firearms violations, and that he was a registered informant.  The motion also said that Rashida Salaam's prior statements and trial testimony were "too inconsistent to be credible."

222.    On February 9, 2021, the Philadelphia County Court of Common Pleas granted Mr. Williams' motion for a new trial in the Haynesworth case. The same day, the court granted the District Attorney's Office motion enter a *nolle prosequi* pursuant to Pa. R. Crim. P. 585(a). In doing so, Philadelphia County Common Pleas Court Judge Tracy Brandeis-Roman called Williams' case "mind-boggling."

223.    Mr. Williams finally walked out of prison a free man on February 9, 2021.

### IV. <u>The City of Philadelphia Perpetrated a Pattern and Practice of Abuses</u>

224.    Appallingly, Christopher Williams' case was not just the product of bad actors. It was also the product of a pattern and practice of unconstitutional actions at the Philadelphia County District Attorney's Office and Philadelphia Police Department during the relevant time period.

47

225.     With respect to Mr. Williams' case, the District Attorney's Office has already admitted that ADA Desiderio violated *Brady v. Maryland*. In its post-conviction motion for nolle prosequi in the Anderson/Reynolds case, the Commonwealth concluded: "After a thorough review and investigation of the case, the Commonwealth has confirmed that . . . a plethora of significant, material exculpatory evidence was not disclosed to the defense at the time of the original trial. . . The recently disclosed *Brady* information further undercuts the uncorroborated accomplice evidence that originally implicated Williams in the crimes. . . ." The Commonwealth conceded that beyond the now discredited and recanted statements of James White, "there is no other competent evidence of Williams' guilt[.]"

226.     The Commonwealth has called Mr. Williams' case a "gross miscarriage of justice."

**A. The DA's Office had policies, patterns, and practices that ensured criminal defendants were not given material exculpatory information**

227.     The failure to disclose exculpatory evidence in Williams' case was not an isolated incident and was instead the result of customs, policies, and practices of the DA's Office prior to and at the time of the unlawful investigation into the murders at issue. The DA's Office, by and through its final policymakers, maintained an official policy, pattern, practice, or custom of suppressing exculpatory material in violation of Williams' and others' constitutional rights.

228.     Specifically, the DA's Office had a policy, pattern, practice or custom of failing to seek out exculpatory evidence that was not affirmatively provided to them by PPD and deliberately withheld police "activity sheets," witness statements, 911 calls, informant impeachment information, and other exculpatory material from defendants charged with a crime. Official written reports created by PPD would be produced to the prosecutor and included in the prosecutor's file given to the defense. By contrast, internal "activity sheets" and the exculpatory information contained therein were stored within the Homicide and District Attorney's Office files and were not produced to anyone

outside the PPD and DA's Office. Most notably, such documents would not be produced to criminal defendants like Williams.

229.    Similarly, prosecutors would not customarily contact PPD detectives to seek out any information not affirmatively contained in detectives' written reports provided to the prosecutor. Thus, for example, prosecutors would not customarily obtain any witness statements or suspect identifications taken during the investigation (such as, here, any written statement taken from Evonne Lackey) or any other daily activity report created by the investigating officers during the investigation. Instead, prosecutors would rely on the final written report, which did not account for further investigative findings.

230.    As a result of these unconstitutional practices, such exculpatory information was documented only in the internal PPD files – documents which by official policy, practice, and custom were never produced to criminal defendants.

231.    Even at such an early stage of this litigation, abundant evidence indicates that the DA's Office encouraged prosecutors to avoid *Brady* obligations as a matter of practice and custom.

232.    Former District Attorney Lynne Abraham, known reputationally as "American's deadliest DA," was at all relevant times the chief policymaker in the DA's Office, and espoused a fundamentally incorrect and unconstitutional interpretation of *Brady's* requirements. Indeed, an Assistant District Attorney admitted at a post-conviction hearing for Christopher Williams that "in older cases, [the District Attorney's Office] did not pass all activity sheets as a matter of course," including at the time of the murders at issue here. The Commonwealth stipulated to this fact during Williams' post-conviction litigation.

233.    Further, at the time of Williams' arrest, the Philadelphia DA's Office had no "open file" discovery. Accordingly, each case's assigned ADA had discretion as to how to handle discovery requests it received from the defense and whether to produce information or not. ADAs faced

significant pressure as a matter of course to withhold exculpatory information because the District Attorney expected that any case that was screened and accepted should result in a conviction. This policy created a "win at all costs" mentality among the ADAs in the DA's Office at the relevant time. Moreover, the DA's Office failed to train prosecutors in the DA's Office regarding their disclosure obligations and, therefore, ADAs were not educated on or informed about their constitutional and ethical disclosure responsibilities. Additionally, the DA's Office compounded these problems, by espousing a policy and practice whereby ADAs did not review underlying DA files in evaluating and responding to post-conviction claims of constitutional violations. This ensured constitutional violations were never corrected.

234.     The need for exculpatory witness statements, suspect identifications, impeachment evidence, and prime suspect material to be recorded in a written report so that it would be produced to the defense was both obvious and well known long before the investigations and trials of Mr. Williams here. Indeed, prosecutors knew that police noted critical exculpatory information regarding investigations, witness statements, and identifications in various formats, including activity sheets, but as a matter of course never sought, requested, or required that such information be transferred to formal reports or other material disclosed to the defense.

235.     Nevertheless, the City of Philadelphia and the DA's Office, by and through its final policymakers, implemented the policy, practice and custom of not disclosing exculpatory material evidence contained in police activity sheets in deliberate indifference to the substantial likelihood that these customs, practices, and policies would result in constitutional violations like those that occurred in Christopher Williams' case.

236.     These policies, customs and practices of the DA's Office were the moving force behind the suppression of exculpatory alternative suspect identifications, witness statements, and

impeachment information regarding White's coerced and fabricated confessions. This directly caused

Williams' wrongful convictions on the Anderson/Reynolds and Haynesworth murders.

**B. PPD maintained a policy, practice, or custom of suppressing exculpatory evidence, fabricating evidence, coercing confessions, and other unconstitutional investigative practices**

237.     Long before Christopher Williams' arrests and convictions, PPD implemented a

policy, pattern, and practice of suppressing exculpatory evidence found during felony investigations

and failing to disclose that information in official police reports or other materials that would be turned

over to the defense. These unconstitutional practices were in effect prior to and long after the unlawful

investigation, prosecution, and incarceration of Christopher Williams.

238.     It was universally known within PPD command structure and among officers that the

DA's Office would not disclose "activity sheets" or similar internal investigative documents to the

defense and/or to the prosecutor. Yet, PPD's custom, policy, and practice was to *not* include the

exculpatory information contained in activity sheets or other investigative documents within the

official police report or to add the police activity sheets as an addendum to the official report. Thus,

PPD and its officers knowingly suppressed key exculpatory information from defendants like

Williams. This operating procedure was either directly commanded by the final policymakers for the

PPD or, in the alternative, was known to those policymakers who permitted it to continue in deliberate

indifference to the likelihood it would result in violations of the constitutional rights of suspects like

Williams.

239.     The need for exculpatory witness statements, suspect identifications, impeachment

evidence, and prime suspect material to be disclosed in a written report so that it would be produced

to the defense was both obvious and well known long before Williams' prosecutions here. Indeed, the

information existed, and was noted by police in various informal formats, including activity sheets,

but was never transferred or added to formal police reports or disclosed in testimony or any other manner to the defense.

240.    Indeed, Williams was not the only wrongfully incarcerated individual who was convicted based on the suppression of PPD activity sheets or logs concealing, among other things, inconsistences in witness statements, alternative suspects, and relevant 911 calls. *See Dennis v. City of Philadelphia,* 379 F. Supp. 3d 420 (E.D. Pa. 2019).

241.    Nevertheless, the PPD, by and through their final policymakers, implemented the policies, practices and customs of not disclosing this exculpatory material evidence contained in police activity sheets in deliberate indifference to the substantial likelihood that this would result in constitutional violations like those that occurred in Williams' case.

242.    PPD also had a custom and practice of permitting officers to engage in a wide variety of similarly improper and unreliable investigative practices, including, but not limited to (i) discrediting witness statements, identifications, and key facts in order to suppress exculpatory information; (ii) obtaining identifications through manipulative and coercive means; (iii) providing information to eyewitnesses or indicating whom eyewitnesses should identify; (iv) manipulating or coercing witnesses into making false or fabricated statements; (v) failing to document or disclose exculpatory evidence; (vi) failing to document or record witness statements and instead relying solely on an officer's claims about what the witness said; (vii) failing to gather or analyze critical physical evidence; and (viii) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices. These widespread customs, patterns and practices are evident from the multiple, repeated violations in this case and others.

243.    In Williams' case, PPD repeatedly failed to disclose to the prosecution or defense their involvement in the fabrication of White's testimony, their reckless and/or intentionally deficient and unreliable investigation into the Anderson/Reynolds murders and Haynesworth murder, or that the

information ADA Desiderio presented to the court was obtained through coercion via the practices described in this Complaint.

244.     Specifically, along with ADA Desiderio, Detectives Harris, Ansel, Cimino, and Hasara worked to construct, compel, or coerce fabricated testimony from James White to falsely implicate Christopher Williams and others and failed to document and disclose material exculpatory evidence to the defense, including, without limitation, the fact that White's account was false, that White's statement was based on coercion and threats of death, that White's statement was also based on improper and unlawful promises made to benefit White that were not contained in the plea agreement disclosed to Williams, and that the details of White's account originated with investigators and ADA Desiderio, not White.

245.     PPD Officers Miller, Rodden, and Witcher, actively suppressed evidence of alternative suspects, including an extensive investigation into Steplight, Steplight's status in the Anderson/Reynolds investigation as the "prime suspect," and other evidence that would have exculpated Williams and/or contradicted the Commonwealth's case at trial and impeached White's statements regarding the seemingly random robbery turned killing.

246.     PPD Officers Rodden, Santiago, Jastrzembski, Dougherty, Durrant, Morton, Margerum, Grier, and Permint deliberately failed to investigate multiple leads – suppressing material exculpatory evidence – disregarded credible witness statements, reported critical 911 calls as "unfounded," dismissed connections to likely suspects, and suppressed material, exculpatory evidence of the PPD's "prime suspect" Steplight.

247.     PPD Officers Bentham and Santiago, among others deliberately suppressed material exculpatory evidence, disregarded credible witness statements, and coerced fabricated testimony leading to the arrest and conviction of Williams for the Haynesworth murder as well.

248.     These constitutional violations caused Williams' wrongful conviction and resulted directly from PPD's custom, pattern, and practice of failing to disclose or dismissing as "unfounded" or "unrelated" material exculpatory evidence, including the failure to disclose the coercion of the only eye-witness' testimony in the case against Williams and the fact that the information provided by White was false, fabricated, and often at odds with physical evidence.

249.     PPD's unconstitutional policies and practices resulted in the violations of others' constitutional rights as well, including but not limited to:

a.     Anthony Wright (CP-51-CR-1131582-1991): Wright was convicted of the rape and murder of Louise Talley, a 77-year-old woman, found stabbed to death in her North Philadelphia home in October of 1991. Wright was 20 years old at the time, and within 24 hours of the murder was coerced into signing a confession by Defendant Detective Santiago. In the coerced confession, Wright stated he was wearing certain clothes on the night he killed the victim, and Defendant Detective Jastrzembski and other PPD officers allegedly recovered those exact clothes, soaked in the victim's blood, in Wright's bedroom under his mattress. Wright was sentenced to life in prison. During post-conviction proceedings, the DNA from the victim was tested and the sperm found inside matched Ronnie Byrd, a convicted felon. Further, the bloody clothes Jastrzembski claimed to have seized from Wright's bedroom did not have Wright's DNA on them, and instead only had the victim's DNA. Trace evidence made it clear that *the victim,* not Wright was wearing them and that Jastrzembski had fabricated and planted evidence.

b.     Jimmy Dennis: In 1992, James Dennis was convicted of killing Chedell Williams, a high school student, in North Philadelphia. The investigation was led by Defendant Detectives Jastrzembski and Santiago. Detectives Jastrzembski and Santiago used

improper photo arrays to suggest Dennis as the murderer. Additionally, Detective Jastrzembski fabricated the existence of certain clothing matching the clothing of the shooter allegedly found at Dennis's residence, but at trial, testified it had since disappeared from police headquarters. Dennis was arrested for the murder in November of 1991. Officers also concealed evidence (a welfare receipt) that would have supported Dennis' alibi at the time of the murder, and coerced false testimony from Charles Thompson, a witness. Dennis's conviction was later overturned by the U.S. Court of Appeals in 2016 based on multiple *Brady* violations. District Judge Anita Brody ruled that the PPD "covered up evidence" that "pointed away" from Dennis' guilt, suppressed key witness statements, and conducted sham suspect lineups.

c.   Donald Ray Adams (CP 51-CR-0743812-1991): Adams was arrested and convicted for the murders of Darryl Patterson and Thomas Winn, which occurred in 1990. PPD Detectives investigated the matter in 1991 after no suspects were arrested. PPD Detectives obtained a coerced and false statement from alleged witness, Donna Benjamin, implicating Mr. Adams in the crime, despite contradictory accounts of the physical descriptions of the assailant. Based on this statement and Donna's later testimony, Adams was convicted. Strikingly similar to the case at hand, in 2007, the Court of Common Pleas granted post-conviction relief based on Donna's recanted testimony that detectives threatened her with incarceration, promised her open criminal charges would be dismissed, and offered her financial and other support for testifying against Adams. Further, other evidence pointed toward another "Don Ray" who lived nearby the victims, fit the description, and who had an ongoing dispute with the victims. Donna later admitted it was "Don Ray" not Donald Ray that was the assailant. After a retrial, Adams was acquitted of all charges.

250.     The unconstitutional policies, customs, and practices of PPD described here were the moving force behind the suppression of the exculpatory suspect identifications, statements regarding the murders, and impeachment information in Williams' case, and thus of his wrongful convictions on January 23, 1992 (Haynesworth) and August 6, 1993, respectively (Anderson/Reynolds).

### C. Defendants PPD and the DA's Office maintained unconstitutional policies, practices, and customs of coercing confessions from witnesses

251.     Prior to and at the time of the unlawful investigation into the murders at issue here, Defendants PPD and the DA's Office, by and through their final policymakers, maintained policies, customs, or patterns and practices of fabricating incriminating evidence and coercing false confessions, in violation of the Fifth and Fourteenth Amendments.

252.     In particular, PPD and the DA's Office used unconstitutional techniques during the investigation phase of a case to coerce inculpatory statements or confessions from suspects and witnesses by giving those suspects and witnesses details about the crime that the police knew (or wanted) to be true, including: making false promises, including the promise that a suspect will be given lenient treatment or favorable sentencing; making false and improper threats, including threats to use statements made in prior plea negotiations to seek the death penalty; the use or threat of physical violence; making improper assertions of guilt, including confrontation with false inculpatory evidence; and providing false assurances so the suspect will benefit from making an inculpatory statement minimizing the suspect's own involvement. These techniques attempt to make false and coerced statements seem credible and reliable.

253.     These policies, practices, and customs, which were well-known to the DA's Office and the City of Philadelphia and its policymakers, began long before Williams' arrest and continued long after Williams' convictions. These policies, practices, and customs have resulted in similar violations committed by the DA's Office and PPD, which illustrate that the departments as a whole, and as a

matter of custom, practice, and policy, disregarded their obligations to refrain from coercing and fabricating false evidence to close cases.

254.   At all relevant times the DA's Office's policy, pattern, custom, and practice of unconstitutionally coercing and fabricating witness and suspect statements to close cases was not conducted in a prosecutorial or judicial role, but as an investigative function normally performed by a detective or police officer. Indeed, the unconstitutional acts described herein – namely the coercion and falsification of James White's statements inculpating Williams' in the Anderson/Reynolds and Haynesworth murders (along with the Graham and Genrette murders for which Williams was acquitted) – were conducted *before Williams was arrested or charged*. ADA Desiderio, in conjunction with Defendant PPD Officers, used unconstitutional techniques to coerce, falsify, and threaten James White into confessing and implicating Williams *before any prosecution or judicial proceeding began*. Thus, in an attempt to find a suspect to arrest for these murders, ADA Desiderio, in concert with the PPD detectives and officers discussed above, acted as an investigator and not as an advocate for the Commonwealth.

255.   In addition to the DA's Office and the PPD's unconstitutional policies, customs, and practices discussed above, Defendants' policy of coercing and falsifying witness or suspect statements to inculpate innocent individuals is further illustrated by the unconstitutional incidents below, which occurred during the relevant period:

   a.   Percy St. George (CP-51-CR-1012571-1993): Percy was charged with capital murder on the basis of a sole witness in 1993. Defendant Detective Santiago obtained the statement from Inmon Goggans, who – because warrants were out for his arrest – represented himself to be David Glenn, a friend of his. Before trial, PPD officers picked up the actual David Glenn and took him to the station, where Detective Santiago coerced him into signing a new, false statement that he witnessed the crime

and identified St. George from a photo array. Since it was Goggans, and not Glenn, who actually witnessed the crime, Glenn later testified to Det. Santiago's misconduct and recanted the statement. Further, Defendant Detective Jastrzembski encouraged the victim's sister to misidentify David Glenn as Goggans, in an attempt to make Detective Santiago's coerced statement by Glenn reliable. St. George moved for a hearing to bar prosecution based on due process violations and Detectives Santiago and Jastrzembski announced their intent to assert their 5th Amendment rights. Shortly afterward, St. George's charges were dismissed.

b.   Malcolm Medley: In 1988, Malcolm Medley was convicted in the Court of Common Pleas of aggravated assault, carrying firearms on public streets or public property, criminal conspiracy, and possessing instruments of crime. In 1987, Medley and Alford were found in possession of a car potentially involved in a shooting, handcuffed, and immediately taken to the police station. Defendant Detective Francis Ansel took a statement from Alford, while Medley was locked in the waiting area until Detective Denham took his statement, wherein no Miranda warnings were ever given. The Supreme Court held that "the conduct of the police officers placed [Medley] in a situation in which he could have reasonably believed that his freedom of movement was restricted . . . . Indeed, it would be difficult to imagine a situation more likely to produce a belief that one's freedom of movement is restricted than that of being frisked, handcuffed, and transported to a police station." *See Commonwealth v. Medley,* 531 Pa. 279 (1992).

c.   Tramayne Blacknall (CP-51-CR-0802721-1999): Blacknall was found guilty of the 1998 murder of Rashawn Calhoun on August 2, 2001, and acquitted of the murder of Eric Baskerville. Mr. Baskerville allegedly had fired shots in Blacknall's direction in

September of 1998, but struck Herb Bryant in the ankle. At least one witness, Steven Driver, alleged he provided a statement implicating Blacknall because police, specifically Defendant Officer Rodden, threatened to charge him and his brother (another witness, Clinton Driver) for the murders. Driver testified Blacknall was not involved in the shooting. Blacknall was granted a new trial on July 13, 2012, on the basis of newly discovered evidence, including alibi testimony and testimony that Clinton Driver confessed to committing the crime.

d.   Donald Ray Adams (CP 51-CR-0743812-1991): Same as described above.

e.   Andrew Swainson (CP-51-CR-0431331-1988): Andrew Swainson was convicted of murder in 1989 based on a single eyewitness, Paul Presley. Presley was originally the PPD's suspect arrested for the shooting moments afterward, covered in blood and running from the scene. Defendant Detective Santiago obtained a statement from Presley implicating himself. The prosecution dropped all charges a few weeks later after Presley told police that Detective Santiago coerced the statement with threats of being charged for a separate drug crime, that he had not seen Swainson at the time of the shooting and only knew what he looked like because Santiago showed him Swainson's picture. Instead of a proper photo array, Presley explained all seven photos shown to him by Detective Santiago were of Swainson. Presley was charged for the crime under a different name and the criminal case was never disclosed to the defense. *See Commonwealth v. Kareem Miller,* CP-51-CR-1024751).

256.   During the investigation and prosecution of Christopher Williams for the murders here, PPD and the DA's Office had policies, practices, patterns, and customs of arresting, charging, and interrogating purported witnesses in criminal investigations without legal cause and with the intent to coerce and/or fabricate statements from these persons, under threat of punishment or material

benefit. These interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

257.     As a result of these unconstitutional patterns, practices, policies, and customs of the PPD in effect at the time of the investigation into the murders here, a Consent Decree was entered by the Eastern District of Pennsylvania requiring wide-reaching reforms in the PPD, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia,* C.A. No. 96-6045.

258.     The unconstitutional policies, practices, patterns, and customs mentioned here directly caused the incarceration and conviction of Williams for the Anderson/Reynolds and Haynesworth murders due to the deliberate indifference of the PPD, City of Philadelphia, and the DA's Office.

**D. PPD maintained a policy, pattern, practice, and custom of failing to adequately train, supervise, or discipline officers**

259.     The Consent Decree mentioned above, entered in *NAACP v. City of Philadelphia,* C.A. No. 96-6045 with Defendant City of Philadelphia, was issued as a result of the NAACP's complaint regarding unconstitutional policies, practices, and customs of the PPD "caused by the failure of defendant City of Philadelphia to properly train, supervise and discipline individual police officers in the Philadelphia Police Department." *See* Doc. PN-PA-0002-0012.

260.     Similarly, the constitutional violations that caused Christopher Williams' wrongful convictions resulted directly from PPD's failure to provide adequate supervision, discipline, and training to deter its officers from: (i) coercing witnesses to obtain unreliable and falsified "information," including false identifications and statements that could be used to close cases, (ii) deliberately and frequently deeming credible and relevant tips, information, and evidence "unfounded" or "unrelated" based on false and unreliable grounds, and (3) knowingly failing to disclose exculpatory information contained within internal documents in its official police reports or to disclose such information to the defense through testimony or other means. The PPD also failed

to provide adequate supervision, discipline, and training to its officers to ensure that officers, including supervisors, met their obligations to report and discipline misconduct by fellow officers.

261.    The PPD's supervisors and commanders not only knowingly permitted these types of officer misconduct, they endorsed and rewarded it. Supervisors allowed officers to use whatever methods they chose to close cases and expended little or no effort to try to determine if the real perpetrator of a crime was arrested. In fact, superiors encouraged officers and detectives to use "activity sheets" when documenting critical eyewitness statements, dates, times, identifications, and other potentially exculpatory information instead of documenting that evidence in an official police report, with full knowledge that those activity sheets would never be disclosed to the defendant.

262.    Defendant PPD officers' misconduct and illegal acts were widely known at every level of the PPD. Indeed, supervisors had both contemporaneous knowledge of the unconstitutional acts of its officers in Williams' case and knowledge of a prior pattern of similar incidents. Although their misconduct was open and notorious, the officers suffered no significant discipline or repercussions and continued their pattern and practice of misconduct in future cases.

263.    In fact, throughout Officers' careers with PPD, supervisors up the chain of command knowingly permitted Officers to violate the constitutional rights of citizens with impunity. With little or no check on their conduct, detectives and officers used the power of the badge to close cases by whatever means and frame innocent people for the crimes of others. No supervisor acted to prevent this through appropriate discipline or supervision, and there was no training provided to deter officers from constant and egregious violations of constitutional rights, or to require other officers to report the misconduct.

264.    Defendant PPD officers had operated so openly and for so long without any apparent repercussions, their regular actions of unconstitutional misconduct continued over decades, including those listed above.

265.     Throughout Defendant officers' tenure at PPD, the Department failed to implement adequate policies, training, procedures, and guidelines to: (1) protect the integrity, legitimacy and accuracy of investigations, prosecutions, and convictions, (2) require exculpatory information to be recorded in a format that would be disclosed to the prosecution and the defense after a suspect was arrested and charged, and (3) not discredit reliable, trustworthy, and consistent exculpatory information as "unfounded" or "irrelevant" and suppress that evidence from the defense. The lack of adequate and appropriate supervision and the failure to discipline and train officers to report the misconduct of their colleagues demonstrates a deliberate indifference toward the known risks that individuals would be accused and convicted of crimes that they did not commit.

266.     The PPD has failed to adequately discipline and train officers, detectives, and supervisors concerning the issue of disclosing exculpatory information and coercing informants, and the immense and foreseeable risk of obtaining false and fabricated evidence as a result of such activity. This failure to discipline and train constitutes deliberate indifference to a substantially certain risk that the constitutional rights of citizens would be violated and that wrongful convictions would almost certainly occur as did here.

267.     The PPD, through its encouragement, ratification, silent acquiescing, and/or approval of the aforementioned policies, customs and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the constitutional rights of Williams and other individuals in the community.

268.     The PPD has also failed to adequately supervise, discipline and train detectives and officers concerning disclosing and reporting exculpatory information and using fabricated and coerced evidence against innocent individuals. This failure to train constitutes deliberate indifference to a substantially certain risk that wrongful convictions would occur.

269. The multiple red flags in this investigation, including, without limitation, the failure to conduct basic investigatory steps, the absence of proper documentation of investigatory steps, the absence of inculpatory information other than one dubious and unsupported eyewitness account from a self-professed murderer, the failure to gather or analyze any physical evidence, the failure to develop any evidence of motive did or should have alerted superiors that this case was part of the pattern of misconduct, that the entire investigation was unreliable, and that the arrest and prosecution of Christopher Williams for these crimes was wrongful.

270. Likewise, because the bulk of information in this case came from one informant who had been coerced – and who had already falsely implicated other individuals in crimes he later confessed to – supervisors, other detectives at PPD, ADA Desiderio, and the DA's Office knew or should have known that White's statements were false. But supervisors and other detectives nonetheless used the information to arrest and convict Williams and clear tough cases.

271. PPD, through its continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to Christopher Williams, and other wrongfully accused individuals' constitutional rights. Indeed, PPD's unconstitutional custom, practice, and polices of suppressing exculpatory evidence and fabricating inculpatory evidence was known to policymakers, and, in deliberate indifference to the substantial risk that similar constitutional violations would recur in the future, no action was taken to discipline officers who had committed such violations, improve policies, supervision, and/or training on these topics, or otherwise prevent such violations from occurring. As a predictable and foreseeable result of those failures to act, Williams was wrongly convicted and incarcerated after unconstitutional and unfair trials based on suppressed exculpatory information and a false confession, fabricated, and coerced by ADA Desiderio and Defendant PPD officers, in violation of the United States and Pennsylvania Constitutions.

**E. The DA's Office and PPD had policies, patterns, and practices that intentionally discriminated against Black men**

272.    The policies, patterns, and practices which led to Mr. Williams' conviction were perpetrated by the DA's Office and PPD against many Black men like Mr. Williams, including those Black men identified in other cases above, on the basis of race.

273.    The DA's Office and PPD treated similarly situated White persons differently and did not subject such persons to the discriminatory policies, patterns, and practices faced by Mr. Williams and other Black men.

274.    Such policies, patterns, and practices were the moving force behind Mr. Williams' constitutional violations.

### V. Defendants Institutionally Discriminated Against Williams Because He is Black

275.    Each of the Defendants discriminated against Mr. Williams because he is Black. They coerced and fabricated evidence, buried and refused to turn over exculpatory evidence, and refused to follow up on credible leads of alternative suspects, among other abuses, because Mr. Williams is Black. This led to his wrongful arrest, prosecution, and conviction in each of the murder cases discussed here.

276.    Mr. Williams was treated differently than other similarly situated White persons investigated by each of the Defendants.

### CLAIMS

### COUNT 1
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation of Liberty Without Due Process and Fair Trial in Violation of the Fourth Amendment and Fourteenth Amendment (Against ADA David Desiderio)

277.    Plaintiff incorporates the foregoing allegations as if fully restated here.

278.    Defendant former ADA David Desiderio initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds Murders, the Haynesworth murder, the Genrette

murder, and the Graham murder. Plaintiff was convicted of the Anderson/Reynolds and Haynesworth murders and sentenced to death. Plaintiff was acquitted by a jury of both the Genrette and Graham murders.

279.   On December 23, 2019, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders after he was granted a re-trial. On February 9, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Haynesworth murder after he was granted a re-trial. Plaintiff was released from prison the same day.

280.   Defendant Desiderio initiated each of the proceedings against Plaintiff without probable cause. Defendant Desiderio coerced James White and others to provide false statements against Plaintiff, which Desiderio knew were false.

281.   Desiderio was investigating the murders at the time he knowingly coerced fabricated testimony from witnesses against Plaintiff. Such coercion and falsification of evidence occurred before Williams was ever mentioned in relation to any of the crimes and before he was ever even arrested or charged with the crimes. Furthermore, at all times relevant to the fabrication of evidence through James White, Desiderio was acting in an investigative capacity as would a police officer.

282.   Williams is innocent of all murders for which he was prosecuted.

283.   Defendant Desiderio, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

284.   Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

285.   Defendant Desiderio acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Desiderio has violated 42 U.S.C. § 1983.

286.    Plaintiff was injured as a direct and proximate result of the Defendant Desiderio's actions and has sustained damages as a result.

287.    The acts and omissions of Defendant Desiderio were intentional, wanton, malicious, reckless, and oppressive.

288.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 2**
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation**
**of Liberty Without Due Process and Fair Trial**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Raymond Dougherty)**

289.    Plaintiff incorporates the foregoing allegations as if fully restated here.

290.    At a minimum, Defendant PPD Detective Raymond Dougherty initiated criminal proceedings against Plaintiff with respect to the Haynesworth murder, and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murder of Haynesworth and sentenced to life in prison.

291.    On February 9, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Haynesworth murder after he was granted a re-trial. Plaintiff was released from prison the same day.

292.    Defendant Dougherty initiated the criminal proceeding against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, Defendant Dougherty knowingly coerced James White to provide a false statement against Plaintiff on December 9, 1989, which Dougherty knew was false.

293.    Williams is innocent of the Haynesworth murder.

294.    Defendant Dougherty, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

295.     Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

296.     Defendant Dougherty acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution.   Accordingly, Defendant Dougherty has violated 42 U.S.C. § 1983.

297.     Plaintiff was injured as a direct and proximate result of the Defendant Dougherty's actions and has sustained damages as a result.

298.     The acts and omissions of Defendant Dougherty were intentional, wanton, malicious, reckless, and oppressive.

299.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 3
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation**
**of Liberty Without Due Process and Fair Trial**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Richard Harris)**

300.     Plaintiff incorporates the foregoing allegations as if fully restated here.

301.     At a minimum, Defendant PPD Detective Richard Harris initiated criminal proceedings against Plaintiff with respect to the Genrette and Haynesworth murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murder of Haynesworth and sentenced to life in prison.

302.     On February 9, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Haynesworth murder after he was granted a re-trial and Plaintiff was released from prison the same day.

303.     Defendant Harris initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful

incarceration. Specifically, at a minimum, Defendant Harris knowingly coerced James White to provide a false statement against Plaintiff on May 3, 1991, with respect to the Haynesworth murder, which Harris knew was false. As a part of his coercion of White, Harris used the fact that he went to high school with White's mother to coerce her and White into providing false testimony against Williams. Further, Harris signed an affidavit of probable cause against Plaintiff with respect to the Genrette murder, when Harris knew there was no probable cause.

304.    Williams is innocent of the Haynesworth and Genrette murders.

305.    Defendant Harris, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

306.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

307.    Defendant Harris acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution.  Accordingly, Defendant Harris has violated 42 U.S.C. § 1983.

308.    Plaintiff was injured as a direct and proximate result of the Defendant Harris's actions and has sustained damages as a result.

309.    The acts and omissions of Defendant Harris were intentional, wanton, malicious, reckless, and oppressive.

310.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 4
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation of Liberty Without Due Process and Fair Trial in Violation of the Fourth Amendment and Fourteenth Amendment (Against Estate of Detective Joseph Hasara)

311.    Plaintiff incorporates the foregoing allegations as if fully restated here.

312.     At a minimum, Defendant PPD Detective Joseph Hasara initiated criminal proceedings against Plaintiff with respect to the Haynesworth, Genrette, Anderson/Reynolds, and Graham murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murder of Haynesworth and sentenced to life in prison.

313.     On February 9, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Haynesworth murder after he was granted a re-trial and Plaintiff was released from prison the same day.

314.     Defendant Hasara initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Hasara knowingly coerced James White to provide false statements against Plaintiff on May 3, 1991, with respect to the Haynesworth, Genrette and Graham murders, which Hasara knew was false. Further, Defendant Hasara was assigned to the Anderson/Reynolds murders and participated in the fabrication of evidence and/or the concealment of evidence to ensure Williams would be prosecuted for a crime he did not commit.

315.     Williams is innocent of all murders.

316.     Defendant Hasara, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

317.     Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

318.     Defendant Hasara acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Hasara has violated 42 U.S.C. § 1983.

319.     Plaintiff was injured as a direct and proximate result of Defendant Hasara's actions and has sustained damages as a result.

320. The acts and omissions of Defendant Hasara were intentional, wanton, malicious, reckless, and oppressive.

321. Defendant Hasara is deceased and, therefore, Plaintiff brings this action against his estate.

322. For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 5
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
of Liberty Without Due Process and Fair Trial
in Violation of the Fourth Amendment and Fourteenth Amendment
(Against Detective Manuel Santiago)**

323. Plaintiff incorporates the foregoing allegations as if fully restated here.

324. At a minimum, Defendant PPD Detective Manuel Santiago initiated criminal proceedings against Plaintiff with respect to the Haynesworth and the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Haynesworth and Anderson/Reynolds and sentenced to death.

325. On December 23, 2019 and February 9, 2021, respectively, the District Attorney's Office decided not to re-charge Plaintiff for the murders and he was released from prison on February 9, 2021.

326. Defendant Santiago initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Santiago knowingly coerced Alton Harvey, James White's roommate, to falsely identify "Chris" in support of the fabricated testimony of James White. Further, Defendant Santiago was assigned to the Anderson/Reynolds murders and participated in the

fabrication of evidence and/or the concealment of evidence to ensure Williams would be prosecuted for a crime he did not commit.

327.    Williams is innocent of all murders.

328.    Defendant Santiago, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

329.    Defendant Santiago perpetrated similar misconduct in other cases, as identified above.

330.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

331.    Defendant Santiago acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Santiago has violated 42 U.S.C. § 1983.

332.    Plaintiff was injured as a direct and proximate result of the Defendant Santiago's actions and has sustained damages as a result.

333.    The acts and omissions of Defendant Santiago were intentional, wanton, malicious, reckless, and oppressive.

334.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 6
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
of Liberty Without Due Process and Fair Trial
in Violation of the Fourth Amendment and Fourteenth Amendment
(Against Detective Frank Jastrzembski)**

335.    Plaintiff incorporates the foregoing allegations as if fully restated here.

336.    At a minimum, Defendant PPD Detective Frank Jastrzembski initiated criminal proceedings against Plaintiff with respect to the Haynesworth and the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration.

Plaintiff was convicted of the murders of Haynesworth and Anderson/Reynolds and sentenced to death.

337.    On December 23, 2019, and February 9, 2021, respectively, the District Attorney's Office decided not to re-charge Plaintiff for the murders and he was released from prison on February 9, 2021.

338.    Defendant Jastrzembski initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Jastrzembski interviewed numerous key witnesses relating to the Haynesworth and Anderson/Reynolds murders and participated in the fabrication of evidence and/or the concealment of evidence to ensure Williams would be prosecuted for a crime he did not commit.

339.    Williams is innocent of all murders.

340.    Defendant Jastrzembski, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

341.    Defendant Jastrzembski perpetrated similar misconduct in other cases, as identified above.

342.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

343.    Defendant Jastrzembski acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Jastrzembski has violated 42 U.S.C. § 1983.

344.    Plaintiff was injured as a direct and proximate result of the Defendant Jastrzembski's actions and has sustained damages as a result.

345.    The acts and omissions of Defendant Jastrzembski were intentional, wanton, malicious, reckless, and oppressive.

346.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 7
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
### of Liberty Without Due Process and Fair Trial
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Charles Bentham)

347.    Plaintiff incorporates the foregoing allegations as if fully restated here.

348.    At a minimum, Defendant PPD Detective Charles Bentham initiated criminal proceedings against Plaintiff with respect to the Haynesworth murder and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murder of Haynesworth and sentenced to life imprisonment.

349.    On February 9, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Haynesworth murder and he was released from prison on February 9, 2021.

350.    Defendant Bentham initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Bentham fed false information to Rasheeda Salaam to implicate Chris Williams and further participated in the fabrication of evidence and/or the concealment of evidence to ensure Williams would be prosecuted for a crime he did not commit.

351.    Williams is innocent of all murders.

352.    Defendant Bentham, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

353.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

73

354.     Defendant Bentham acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Bentham has violated 42 U.S.C. § 1983.

355.     Plaintiff was injured as a direct and proximate result of the Defendant Bentham's actions and has sustained damages as a result.

356.     The acts and omissions of Defendant Bentham were intentional, wanton, malicious, reckless, and oppressive.

357.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 8
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
### of Liberty Without Due Process and Fair Trial
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Frank Ansel)

358.     Plaintiff incorporates the foregoing allegations as if fully restated here.

359.     At a minimum, Defendant PPD Detective Frank Ansel initiated criminal proceedings against Plaintiff with respect to the Graham and Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

360.     On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

361.     Defendant Ansel initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Ansel fed false information to James White to implicate Chris Williams on November 4, 1991 and November 13, 1991 and further participated in

the fabrication of evidence and/or the concealment of evidence to ensure Williams would be prosecuted for a crime he did not commit.

362.    Williams is innocent of all murders.

363.    Defendant Ansel, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

364.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

365.    Defendant Ansel acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Ansel has violated 42 U.S.C. § 1983.

366.    Plaintiff was injured as a direct and proximate result of the Defendant Ansel's actions and has sustained damages as a result.

367.    The acts and omissions of Defendant Ansel were intentional, wanton, malicious, reckless, and oppressive.

368.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 9
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation of Liberty Without Due Process and Fair Trial in Violation of the Fourth Amendment and Fourteenth Amendment (Against Detective John Cimino)

369.    Plaintiff incorporates the foregoing allegations as if fully restated here.

370.    At a minimum, Defendant PPD Detective Frank Cimino initiated criminal proceedings against Plaintiff with respect to the Graham and Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

371.    On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

372.    Defendant Cimino initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Cimino fed false information to James White to implicate Chris Williams on November 4, 1991 and November 13, 1991 and further participated in the fabrication of evidence and/or the concealment of evidence to ensure Williams would be prosecuted for a crime he did not commit.

373.    Williams is innocent of all murders.

374.    Defendant Cimino, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

375.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

376.    Defendant Cimino acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Cimino has violated 42 U.S.C. § 1983.

377.    Plaintiff was injured as a direct and proximate result of the Defendant Cimino's actions and has sustained damages as a result.

378.    The acts and omissions of Defendant Cimino were intentional, wanton, malicious, reckless, and oppressive.

379.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 10
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
### of Liberty Without Due Process and Fair Trial
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Estate of Detective Charles Permint)

380.     Plaintiff incorporates the foregoing allegations as if fully restated here.

381.     At a minimum, Defendant PPD Detective Charles Permint initiated criminal proceedings against Plaintiff with respect to the Graham and Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

382.     On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

383.     Defendant Permint initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Permint deliberately suppressed evidence of an alternative suspect and/or evidence which would have indicated someone other than Williams committed the Anderson/Reynolds murders. Specifically, as discussed above, Detective Permint deliberately stated witness Evonne Lackey did not know decedent Gavin Anderson when she had provided information to the contrary and, further, deliberately misidentified Ms. Lackey's location at the time she heard gunshots, which permitted the police to conclude her statement was "unrelated" to the Anderson/Reynolds murders.

384.     Williams is innocent of all murders.

385.     Defendant Permint, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

386.     Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

387.     Defendant Permint acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Permint has violated 42 U.S.C. § 1983.

388.     Plaintiff was injured as a direct and proximate result of the Defendant Permint's actions and has sustained damages as a result.

389.     The acts and omissions of Defendant Permint were intentional, wanton, malicious, reckless, and oppressive.

390.     Plaintiff brings this action against the Estate of Charles Permint because he is deceased.

391.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 11
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation of Liberty Without Due Process and Fair Trial in Violation of the Fourth Amendment and Fourteenth Amendment (Against Detective Frank Miller)

392.     Plaintiff incorporates the foregoing allegations as if fully restated here.

393.     At a minimum, Defendant PPD Detective Frank Miller initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

394.     On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

395.     Defendant Miller initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Miller identified Noel Grierson aka "Steplight" as the "prime suspect" in the Anderson/Graham murders and deliberately suppressed evidence of it, which would have indicated someone other than Williams committed the Anderson/Reynolds murders.

396.     Williams is innocent of all murders.

397.     Defendant Miller, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

398.     Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

399.     Defendant Miller acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Miller has violated 42 U.S.C. § 1983.

400.     Plaintiff was injured as a direct and proximate result of the Defendant Miller's actions and has sustained damages as a result.

401.     The acts and omissions of Defendant Miller were intentional, wanton, malicious, reckless, and oppressive.

402.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 12**
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation**
**of Liberty Without Due Process and Fair Trial**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Gregory Rodden)**

403.     Plaintiff incorporates the foregoing allegations as if fully restated here.

404.     At a minimum, Defendant PPD Detective Gregory Rodden initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

405.     On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

406.     Defendant Rodden initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Rodden identified Noel Grierson aka "Steplight" as the "prime suspect" in the Anderson/Graham murders and deliberately suppressed evidence of it, which would have indicated someone other than Williams committed the Anderson/Reynolds murders. Further, Defendant Rodden suppressed additional evidence that would have indicated someone other than Williams committed the murders and that the murders were almost certainly not a random robbery for money and/or drugs, including information from the Anderson brothers' father, Eglam, regarding the brothers being at Prime Time Restaurant on the night of the murders and that a man named Dwight, the brother of a man Otis Reynolds had robbed, was looking for Reynolds. A woman named Donna Steele corroborated the fact that "Dwight" was interested in the whereabouts and condition of the three victims as he had called her to report their murders. Rodden appreciated the significance of these leads as he had Detective Margerum at the Violent Offenders Traffickers Unit look into them and yet actively suppressed them.

407.     Williams is innocent of all murders.

408.     Defendant Rodden, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

409.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

410.    Defendant Rodden acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Rodden has violated 42 U.S.C. § 1983.

411.    Plaintiff was injured as a direct and proximate result of the Defendant Rodden's actions and has sustained damages as a result.

412.    The acts and omissions of Defendant Rodden were intentional, wanton, malicious, reckless, and oppressive.

413.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 13**
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation**
**of Liberty Without Due Process and Fair Trial**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective James Morton)**

414.    Plaintiff incorporates the foregoing allegations as if fully restated here.

415.    At a minimum, Defendant PPD Detective James Morton initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

416.    On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

417.    Defendant Morton initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful

incarceration. Specifically, at a minimum, Defendant Morton actively suppressed evidence of alternative suspects in the Anderson/Reynolds murders. He determined Ms. Perry's statement to him regarding the night of the murders to be "unrelated" without cause and further suppressed information regarding Anderson/Reynolds connection to the ongoing war between the Posse and JBM.

418.    Williams is innocent of all murders.

419.    Defendant Morton, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

420.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

421.    Defendant Morton acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Morton has violated 42 U.S.C. § 1983.

422.    Plaintiff was injured as a direct and proximate result of the Defendant Morton's actions and has sustained damages as a result.

423.    The acts and omissions of Defendant Morton were intentional, wanton, malicious, reckless, and oppressive.

424.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 14
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
### of Liberty Without Due Process and Fair Trial
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Frank Margerum)

425.    Plaintiff incorporates the foregoing allegations as if fully restated here.

426.     At a minimum, Defendant PPD Detective Frank Margerum initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

427.     On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

428.     Defendant Margerum initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Margerum actively suppressed evidence of alternative suspects in the Anderson/Reynolds murders, including Noel Grierson aka "Steplight."

429.     Williams is innocent of all murders.

430.     Defendant Margerum, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

431.     Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

432.     Defendant Margerum acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Margerum has violated 42 U.S.C. § 1983.

433.     Plaintiff was injured as a direct and proximate result of the Defendant Margerum's actions and has sustained damages as a result.

434.     The acts and omissions of Defendant Margerum were intentional, wanton, malicious, reckless, and oppressive.

435.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 15**
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation**
**of Liberty Without Due Process and Fair Trial**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Raleigh Witcher)**

436.    Plaintiff incorporates the foregoing allegations as if fully restated here.

437.    At a minimum, Defendant PPD Detective Raleigh Witcher initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

438.    On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

439.    Defendant Witcher supervised the Anderson/Reynolds murder investigation. Defendant Witcher initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Witcher actively suppressed evidence of alternative suspects in the Anderson/Reynolds murders, including Noel Grierson aka "Steplight."

440.    Williams is innocent of all murders.

441.    Defendant Witcher, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

442.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

443.     Defendant Witcher acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Witcher has violated 42 U.S.C. § 1983.

444.     Plaintiff was injured as a direct and proximate result of the Defendant Witcher's actions and has sustained damages as a result.

445.     The acts and omissions of Defendant Witcher were intentional, wanton, malicious, reckless, and oppressive.

446.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 16
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
of Liberty Without Due Process and Fair Trial
in Violation of the Fourth Amendment and Fourteenth Amendment
(Against Detective Arthur Durrant)**

447.     Plaintiff incorporates the foregoing allegations as if fully restated here.

448.     At a minimum, Defendant PPD Detective Arthur Durrant initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

449.     On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

450.     Defendant Durrant supervised the Anderson/Reynolds murder investigation. Defendant Durrant initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration.

Specifically, at a minimum, Defendant Durrant actively suppressed evidence of alternative suspects in the Anderson/Reynolds murders, including Noel Grierson aka "Steplight."

451.     Williams is innocent of all murders.

452.     Defendant Durrant, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

453.     Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

454.     Defendant Durrant acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Durrant has violated 42 U.S.C. § 1983.

455.     Plaintiff was injured as a direct and proximate result of the Defendant Durrant's actions and has sustained damages as a result.

456.     The acts and omissions of Defendant Durrant were intentional, wanton, malicious, reckless, and oppressive.

457.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 17
**42 U.S.C. § 1983 – Malicious Prosecution and Deprivation**
**of Liberty Without Due Process and Fair Trial**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Michael Burke)**

458.     Plaintiff incorporates the foregoing allegations as if fully restated here.

459.     At a minimum, Defendant PPD Detective Michael Burke initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

460.     On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

461.     Defendant Burke supervised the Anderson/Reynolds murder investigation. Defendant Burke initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Burke actively suppressed evidence of alternative suspects in the Anderson/Reynolds murders, including Noel Grierson aka "Steplight."

462.     Williams is innocent of all murders.

463.     Defendant Burke, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

464.     Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

465.     Defendant Burke acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Burke has violated 42 U.S.C. § 1983.

466.     Plaintiff was injured as a direct and proximate result of the Defendant Burke's actions and has sustained damages as a result.

467.     The acts and omissions of Defendant Burke were intentional, wanton, malicious, reckless, and oppressive.

468.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 18
### 42 U.S.C. § 1983 – Malicious Prosecution and Deprivation
### of Liberty Without Due Process and Fair Trial
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against PPD Detective John Grier)

469.    Plaintiff incorporates the foregoing allegations as if fully restated here.

470.    At a minimum, Defendant PPD Detective John Grier initiated criminal proceedings against Plaintiff with respect to the Anderson/Reynolds murders and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Plaintiff was convicted of the murders of Anderson/Reynolds and sentenced to death.

471.    On December 23, 2021, the District Attorney's Office decided not to re-charge Plaintiff for the Anderson/Reynolds murders and he was ultimately released from prison on February 9, 2021.

472.    Defendant Grier initiated the criminal proceedings against Plaintiff without probable cause and/or violated Plaintiff's constitutional rights in such a way that led to his wrongful incarceration. Specifically, at a minimum, Defendant Grier actively suppressed evidence of an alternative suspect in the Anderson/Reynolds murders, namely, "Q" aka Derrick Steplight who had been selling drugs and firearms two blocks from where the JBM warned Anderson/Reynolds not to sell drugs and had been implicated by Anthony Thigpen in the Anderson/Reynolds murders.

473.    Williams is innocent of all murders.

474.    Defendant Grier, knowing that he was falsifying evidence against Williams, acted maliciously or for a purpose other than bringing Plaintiff to justice.

475.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding, given that he was wrongfully incarcerated for over 30 years.

476.     Defendant Grier acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Grier has violated 42 U.S.C. § 1983.

477.     Plaintiff was injured as a direct and proximate result of the Defendant Grier's actions and has sustained damages as a result.

478.     The acts and omissions of Defendant Grier were intentional, wanton, malicious, reckless, and oppressive.

479.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 19
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against ADA David Desiderio)

480.     Plaintiff incorporates the foregoing allegations as if fully restated here.

481.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

482.     Defendant Desiderio had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

483.     Defendant Desiderio had a realistic and reasonable opportunity to intervene as the lead prosecutor on all subject murder cases. He had the opportunity to do this immediately at the outset of the investigative phase as it related to Christopher Williams. However, he chose to intentionally and maliciously proceed against Christopher Williams, investigating and developing the false story from White that Williams was involved in several murders, despite the fact that he knew Williams was innocent.

484.     Defendant Desiderio acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Desiderio has violated 42 U.S.C. § 1983.

485.     Plaintiff was injured as a direct and proximate result of the Defendant Desiderio's actions and has sustained damages as a result.

486.     The acts and omissions of Defendant Desiderio were intentional, wanton, malicious, reckless, and oppressive.

487.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 20
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Lynne Abraham)

488.     Plaintiff incorporates the foregoing allegations as if fully restated here.

489.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

490.     Defendant Lynne Abraham, Philadelphia District Attorney during the relevant time period of the investigations and prosecutions of Christopher Williams, had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

491.     Defendant Abraham had a realistic and reasonable opportunity to intervene as the Philadelphia District Attorney on all subject murder cases. However, she chose to intentionally and maliciously permit the DA's Office to proceed against Christopher Williams despite the fact that she knew Williams was innocent.

492.     Defendant Abraham acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Abraham has violated 42 U.S.C. § 1983.

493.     Plaintiff was injured as a direct and proximate result of the Defendant Abraham's actions and has sustained damages as a result.

494.     The acts and omissions of Defendant Abraham were intentional, wanton, malicious, reckless, and oppressive.

495.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 21**
**42 U.S.C. § 1983 – Failure to Intervene**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against ADA David Webb)**

496.     Plaintiff incorporates the foregoing allegations as if fully restated here.

497.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

498.     Defendant David Webb, Chief of Homicide in the DA's Office during the relevant time period of the investigations and prosecutions of Christopher Williams, had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

499.     Defendant Webb had a realistic and reasonable opportunity to intervene as the Chief of Homicide on all subject murder cases. However, he chose to intentionally and maliciously permit the DA's Office to proceed against Christopher Williams despite the fact that he knew Williams was innocent.

500.     Defendant Webb acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Webb has violated 42 U.S.C. § 1983.

501.     Plaintiff was injured as a direct and proximate result of the Defendant Webb's actions and has sustained damages as a result.

502.    The acts and omissions of Defendant Webb were intentional, wanton, malicious, reckless, and oppressive.

503.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 22
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Raymond Dougherty)

504.    Plaintiff incorporates the foregoing allegations as if fully restated here.

505.    Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

506.    Defendant Detective Raymond Dougherty had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

507.    Defendant Dougherty had a realistic and reasonable opportunity to intervene. However, he chose intentionally and maliciously to proceed against Christopher Williams despite the fact that he knew Williams was innocent.

508.    Defendant Dougherty acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Dougherty has violated 42 U.S.C. § 1983.

509.    Plaintiff was injured as a direct and proximate result of the Defendant Dougherty's actions and has sustained damages as a result.

510.    The acts and omissions of Defendant Dougherty were intentional, wanton, malicious, reckless, and oppressive.

511.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 23
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Richard Harris)

512.     Plaintiff incorporates the foregoing allegations as if fully restated here.

513.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

514.     Defendant Detective Richard Harris had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

515.     Defendant Harris had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

516.     Defendant Harris acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Harris has violated 42 U.S.C. § 1983.

517.     Plaintiff was injured as a direct and proximate result of the Defendant Harris's actions and has sustained damages as a result.

518.     The acts and omissions of Defendant Harris were intentional, wanton, malicious, reckless, and oppressive.

519.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 24
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Estate of Detective Joseph Hasara)

520.     Plaintiff incorporates the foregoing allegations as if fully restated here.

521.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

522.     Defendant Detective Joseph Hasara had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

523.     Defendant Hasara had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

524.     Defendant Hasara acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Harris has violated 42 U.S.C. § 1983.

525.     Plaintiff was injured as a direct and proximate result of the Defendant Hasara's actions and has sustained damages as a result.

526.     The acts and omissions of Defendant Hasara were intentional, wanton, malicious, reckless, and oppressive.

527.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

### COUNT 25
**42 U.S.C. § 1983 – Failure to Intervene**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Manuel Santiago)**

528.     Plaintiff incorporates the foregoing allegations as if fully restated here.

529.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

530.     Defendant Detective Manual Santiago had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

531.     Defendant Santiago had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

532.     Defendant Santiago acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Santiago has violated 42 U.S.C. § 1983.

533.     Plaintiff was injured as a direct and proximate result of the Defendant Santiago's actions and has sustained damages as a result.

534.     The acts and omissions of Defendant Santiago were intentional, wanton, malicious, reckless, and oppressive.

535.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 26
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Frank Jastrzembski)

536.     Plaintiff incorporates the foregoing allegations as if fully restated here.

537.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

538.     Defendant Detective Frank Jastrzembski had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

539.     Defendant Jastrzembski had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

540.     Defendant Jastrzembski acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Jastrzembski has violated 42 U.S.C. § 1983.

541.     Plaintiff was injured as a direct and proximate result of the Defendant Jastrzembski's actions and has sustained damages as a result.

542.     The acts and omissions of Defendant Jastrzembski were intentional, wanton, malicious, reckless, and oppressive.

543.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 27
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Charles Bentham)

544.     Plaintiff incorporates the foregoing allegations as if fully restated here.

545.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

546.     Defendant Detective Charles Bentham had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

547.     Defendant Bentham had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously to proceed against Christopher Williams despite the fact that he knew Williams was innocent.

548.     Defendant Bentham acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Bentham has violated 42 U.S.C. § 1983.

549.     Plaintiff was injured as a direct and proximate result of the Defendant Bentham's actions and has sustained damages as a result.

550.     The acts and omissions of Defendant Bentham were intentional, wanton, malicious, reckless, and oppressive.

551.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 28**
**42 U.S.C. § 1983 – Failure to Intervene**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Frank Ansel)**

552.     Plaintiff incorporates the foregoing allegations as if fully restated here.

553.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

554.     Defendant Detective Frank Ansel had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

555.     Defendant Ansel had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

556.     Defendant Ansel acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Ansel has violated 42 U.S.C. § 1983.

557.     Plaintiff was injured as a direct and proximate result of the Defendant Ansel's actions and has sustained damages as a result.

558.     The acts and omissions of Defendant Ansel were intentional, wanton, malicious, reckless, and oppressive.

559.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 29
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective John Cimino)

560.    Plaintiff incorporates the foregoing allegations as if fully restated here.

561.    Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

562.    Defendant Detective John Cimino had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

563.    Defendant Cimino had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

564.    Defendant Cimino acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Cimino has violated 42 U.S.C. § 1983.

565.    Plaintiff was injured as a direct and proximate result of the Defendant Cimino's actions and has sustained damages as a result.

566.    The acts and omissions of Defendant Cimino were intentional, wanton, malicious, reckless, and oppressive.

567.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 30
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Estate of Detective Charles Permint)

568.    Plaintiff incorporates the foregoing allegations as if fully restated here.

569.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

570.     Defendant Detective Charles Permint had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

571.     Defendant Permint had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

572.     Defendant Permint acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Permint has violated 42 U.S.C. § 1983.

573.     Plaintiff was injured as a direct and proximate result of the Defendant Permint's actions and has sustained damages as a result.

574.     The acts and omissions of Defendant Permint were intentional, wanton, malicious, reckless, and oppressive.

575.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 31**
**42 U.S.C. § 1983 – Failure to Intervene**
**in Violation of the Fourth Amendment and Fourteenth Amendment**
**(Against Detective Frank Miller)**

576.     Plaintiff incorporates the foregoing allegations as if fully restated here.

577.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

578.     Defendant Detective Frank Miller had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

579.    Defendant Miller had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

580.    Defendant Miller acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Miller has violated 42 U.S.C. § 1983.

581.    Plaintiff was injured as a direct and proximate result of the Defendant Miller's actions and has sustained damages as a result.

582.    The acts and omissions of Defendant Miller were intentional, wanton, malicious, reckless, and oppressive.

583.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 32
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Gregory Rodden)

584.    Plaintiff incorporates the foregoing allegations as if fully restated here.

585.    Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

586.    Defendant Detective Gregory Rodden had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

587.    Defendant Rodden had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

588.   Defendant Rodden acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Rodden has violated 42 U.S.C. § 1983.

589.   Plaintiff was injured as a direct and proximate result of the Defendant Rodden's actions and has sustained damages as a result.

590.   The acts and omissions of Defendant Rodden were intentional, wanton, malicious, reckless, and oppressive.

591.   For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 33
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective James Morton)

592.   Plaintiff incorporates the foregoing allegations as if fully restated here.

593.   Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

594.   Defendant Detective James Morton had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

595.   Defendant Morton had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

596.   Defendant Morton acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Morton has violated 42 U.S.C. § 1983.

597.   Plaintiff was injured as a direct and proximate result of the Defendant Morton's actions and has sustained damages as a result.

598.     The acts and omissions of Defendant Morton were intentional, wanton, malicious, reckless, and oppressive.

599.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 34
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Frank Margerum)

600.     Plaintiff incorporates the foregoing allegations as if fully restated here.

601.     Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

602.     Defendant Detective Frank Margerum had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

603.     Defendant Margerum had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

604.     Defendant Margerum acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Margerum has violated 42 U.S.C. § 1983.

605.     Plaintiff was injured as a direct and proximate result of the Defendant Margerum's actions and has sustained damages as a result.

606.     The acts and omissions of Defendant Margerum were intentional, wanton, malicious, reckless, and oppressive.

607.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 35
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Raleigh Witcher)

608.    Plaintiff incorporates the foregoing allegations as if fully restated here.

609.    Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

610.    Defendant Detective Raleigh Witcher had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

611.    Defendant Witcher had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously to proceed against Christopher Williams despite the fact that he knew Williams was innocent.

612.    Defendant Witcher acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Margerum has violated 42 U.S.C. § 1983.

613.    Plaintiff was injured as a direct and proximate result of the Defendant Witcher's actions and has sustained damages as a result.

614.    The acts and omissions of Defendant Witcher were intentional, wanton, malicious, reckless, and oppressive.

615.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 36
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Arthur Durrant)

616.    Plaintiff incorporates the foregoing allegations as if fully restated here.

103

617.    Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

618.    Defendant Detective Arthur Durrant had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

619.    Defendant Durrant had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

620.    Defendant Durrant acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Durrant has violated 42 U.S.C. § 1983.

621.    Plaintiff was injured as a direct and proximate result of the Defendant Durrant's actions and has sustained damages as a result.

622.    The acts and omissions of Defendant Durrant were intentional, wanton, malicious, reckless, and oppressive.

623.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 37
### 42 U.S.C. § 1983 – Failure to Intervene
### in Violation of the Fourth Amendment and Fourteenth Amendment
### (Against Detective Michael Burke)

624.    Plaintiff incorporates the foregoing allegations as if fully restated here.

625.    Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated.

626.    Defendant Detective Michael Burke had a duty to intervene to stop witness statements being coerced and fabricated and evidence being hidden, suppressed, and ignored.

627.   Defendant Burke had a realistic and reasonable opportunity to intervene. However, he chose to intentionally and maliciously proceed against Christopher Williams despite the fact that he knew Williams was innocent.

628.   Defendant Burke acted under the color of state law to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. Accordingly, Defendant Burke has violated 42 U.S.C. § 1983.

629.   Plaintiff was injured as a direct and proximate result of the Defendant Burke's actions and has sustained damages as a result.

630.   The acts and omissions of Defendant Burke were intentional, wanton, malicious, reckless, and oppressive.

631.   For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 38**
**42 U.S.C. § 1983 – Supervisory Liability**
**(Against ADA David Desiderio)**

632.   Plaintiff incorporates the foregoing allegations as if fully restated here.

633.   As the lead prosecutor on the murder cases and a supervisor of other prosecutors and police, Defendant Desiderio participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.

634.   Plaintiff's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

635.   For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 39
### 42 U.S.C. § 1983 – Supervisory Liability
### (Against Detective Raleigh Witcher)

636.     Plaintiff incorporates the foregoing allegations as if fully restated here.

637.     As one of the supervising detectives on the Anderson/Reynolds murders, Defendant Witcher participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.

638.     Plaintiff's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

639.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 40
### 42 U.S.C. § 1983 – Supervisory Liability
### (Against Detective Arthur Durrant)

640.     Plaintiff incorporates the foregoing allegations as if fully restated here.

641.     As one of the supervising detectives on the Anderson/Reynolds murders, Defendant Durrant participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.

642.     Plaintiff's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

643.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 41
### 42 U.S.C. § 1983 – Supervisory Liability
### (Against Detective Michael Burke)

644.     Plaintiff incorporates the foregoing allegations as if fully restated here.

645. As one of the supervising detectives on the Anderson/Reynolds murders, Defendant Burke participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.

646. Plaintiff's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

647. For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 42**
**42 U.S.C. § 1983 – Supervisory Liability**
**(Against DA Lynne Abraham)**

648. Plaintiff incorporates the foregoing allegations as if fully restated here.

649. As the District Attorney of Philadelphia, Defendant Abraham was aware of these high-profile cases wherein Mr. Williams was charged with six separate murders over the course of a few months. DA Abraham participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in her subordinates' violations.

650. Plaintiff's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

651. For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 43**
**42 U.S.C. § 1983 – Supervisory Liability**
**(Against ADA David Webb)**

652. Plaintiff incorporates the foregoing allegations as if fully restated here.

653. As the Chief of Homicide, Defendant Webb was aware of these high-profile cases wherein Mr. Williams was charged with six separate murders over the course of a few months. DA

Webb participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.

654.    Plaintiff's constitutional rights were violated as a direct and proximate result and Plaintiff suffered damages.

655.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 44**</u>
**42 U.S.C. § 1983 – Equal Protection/Race Discrimination**
**(Against Defendants Desiderio, Dougherty, Harris, Hasara, Santiago, Jastrzembski, Bentham, Ansel, Cimino, Permint, Miller, Rodden, Morton, Margerum, Witcher, Durrant, Burke, and Grier)**

656.    Plaintiff incorporates the foregoing allegations as if fully restated here.

657.    Defendants Desiderio, Dougherty, Harris, Hasara, Santiago, Jastrzembski, Bentham, Ansel, Cimino, Permint, Miller, Rodden, Morton, Margerum, Witcher, Durrant, Burke, and Grier intentionally discriminated against Mr. Williams through the above-described actions because is a Black man.

658.    These Defendants did not perpetrate misconduct similarly with respect to similarly situated White persons related to criminal investigations.

659.    These Defendant acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution. Accordingly, Defendants violated 42 U.S.C. § 1983.

660.    Plaintiff was injured as a direct and proximate result of these Defendants' actions and has sustained damages as a result.

661.    The acts and omissions of these Defendants were intentional, wanton, malicious, reckless, and oppressive.

662.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 45
### 42 U.S.C. § 1983 – Civil Rights Conspiracy
### (Against All Defendants)

663.     Plaintiff incorporates the foregoing allegations as if fully restated here.

664.     Defendants combined to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose, namely, to arrest, prosecute, and convict Christopher Williams despite knowing he was innocent of the murders.

665.     Defendants specifically conspired to conceal and ignore alternative suspects, to conceal and ignore evidence of Williams' innocence, and to fabricate evidence to convict Williams, including but not limited to the coercion and knowing fabrication of the testimony of James White.

666.     Plaintiff's constitutional rights were violated as a direct and proximate result of such agreement and actions in furtherance thereof.

667.     Plaintiff suffered damages as a result.

668.     For this count, Plaintiff seeks actual damages, punitive damages against the individual defendants, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 46
### 42 U.S.C. § 1983 – *Monell* Liability
### (Against City of Philadelphia and Philadelphia DA's Office)

669.     Plaintiff incorporates the foregoing allegations as if fully restated here.

670.     The City of Philadelphia, through the Philadelphia DA's Office and Philadelphia PPD, in violation of Plaintiff's Fourth and Fourteenth Amendment rights, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of coercion of false witness testimony, fabrication of evidence, and ignoring and suppressing material exculpatory evidence, as set forth above.

671.     Further, the City of Philadelphia consciously or deliberately failed to train on, supervise, or discipline for the above failures, which knowingly led to repeated constitutional

violations, including those Mr. Williams was subject to here. The City of Philadelphia acted with deliberate indifference to Mr. Williams' constitutional rights in all of these respects.

672.    Additionally, the City's policies, practices, customs, and failures discriminated against Mr. Williams because he is a Black man. Those policies and failures were designed and implemented, or knowingly permitted to occur, to target Black men like Mr. Williams. Similarly situated White persons were not subject to the City's unconstitutional practices.

673.    Furthermore, former DA Lynne Abraham was a policymaker for the District Attorney's Office during the relevant time period. With deliberate indifference to the consequences, Defendant Abraham established and maintained a policy, practice or custom which directly caused Plaintiff's constitutional harms.

674.    The City of Philadelphia and DA's Office acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above.  Accordingly, the City of Philadelphia and DA's Office have violated 42 U.S.C. § 1983.

675.    Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs of the City of Philadelphia.

676.    Plaintiff has sustained damages as a result

677.    For this count, Plaintiff seeks actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## <u>COUNT 47</u>
### Pennsylvania Common Law – Malicious Prosecution
### (Against ADA David Desiderio)

678.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 274-285 above.

679.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

680.    The proceedings were terminated favorably for Mr. Williams.

681.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

682.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 48**
**Pennsylvania Common Law – Malicious Prosecution**
**(Against Detective Raymond Dougherty)**

683.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 286-296 above.

684.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

685.    The proceedings were terminated favorably for Mr. Williams.

686.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

687.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 49**
**Pennsylvania Common Law – Malicious Prosecution**
**(Against Detective Richard Harris)**

688.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 297-307 above.

689.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

690.    The proceedings were terminated favorably for Mr. Williams.

691.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

692.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 50**
**Pennsylvania Common Law – Malicious Prosecution**
**(Against Estate of Detective Joseph Hasara)**

693.     Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 308-319 above.

694.     Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

695.     The proceedings were terminated favorably for Mr. Williams.

696.     Mr. Williams' constitutional rights were violated as a result and he suffered damages.

697.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 51**
**Pennsylvania Common Law – Malicious Prosecution**
**(Against Detective Manuel Santiago)**

698.     Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 320-331 above.

699.     Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

700.     The proceedings were terminated favorably for Mr. Williams.

701.     Mr. Williams' constitutional rights were violated as a result and he suffered damages.

702.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 52**
**Pennsylvania Common Law – Malicious Prosecution**
**(Against Detective Frank Jastrzembski)**

703.     Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 332-343 above.

112

704.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

705.    The proceedings were terminated favorably for Mr. Williams.

706.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

707.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 53**</u>
**Pennsylvania Common Law – Malicious Prosecution**
**(Against Detective Charles Bentham)**

708.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 344-354 above.

709.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

710.    The proceedings were terminated favorably for Mr. Williams.

711.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

712.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 54**</u>
**Pennsylvania Common Law – Malicious Prosecution**
**(Against Detective Frank Ansel)**

713.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 355-365 above.

714.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

715.    The proceedings were terminated favorably for Mr. Williams.

716.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

717.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 55
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective John Cimino)

718.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 366-376 above.

719.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

720.    The proceedings were terminated favorably for Mr. Williams.

721.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

722.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 56
### Pennsylvania Common Law – Malicious Prosecution
### (Against Estate of Detective Charles Permint)

723.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 377-388 above.

724.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

725.    The proceedings were terminated favorably for Mr. Williams.

726.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

727.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 57
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective Frank Miller)

728.     Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 389-399 above.

729.     Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

730.     The proceedings were terminated favorably for Mr. Williams.

731.     Mr. Williams' constitutional rights were violated as a result and he suffered damages.

732.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 58
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective Gregory Rodden)

733.     Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 400-410.

734.     Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

735.     The proceedings were terminated favorably for Mr. Williams.

736.     Mr. Williams' constitutional rights were violated as a result and he suffered damages.

737.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 59
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective James Morton)

738.     Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 411-421 above.

739.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

740.    The proceedings were terminated favorably for Mr. Williams.

741.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

742.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 60
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective Frank Margerum)

743.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 422-432 above.

744.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

745.    The proceedings were terminated favorably for Mr. Williams.

746.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

747.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 61
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective Raleigh Witcher)

748.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 433-443 above.

749.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

750.    The proceedings were terminated favorably for Mr. Williams.

751.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

752.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 62
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective Arthur Durrant)

753.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 444-454 above.

754.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

755.    The proceedings were terminated favorably for Mr. Williams.

756.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

757.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 63
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective Michael Burke)

758.    Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 455-465 above.

759.    Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

760.    The proceedings were terminated favorably for Mr. Williams.

761.    Mr. Williams' constitutional rights were violated as a result and he suffered damages.

762.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 64
### Pennsylvania Common Law – Malicious Prosecution
### (Against Detective John Grier)

763.     Plaintiff incorporates the foregoing allegations as if fully restated here, including paragraphs 466-476.

764.     Defendant brought the proceedings against Mr. Williams with malice and without probable cause.

765.     The proceedings were terminated favorably for Mr. Williams.

766.     Mr. Williams' constitutional rights were violated as a result and he suffered damages.

767.     For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 65
### Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress
### (Against ADA David Desiderio)

768.     Plaintiff incorporates the foregoing allegations as if fully restated here.

769.     Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

770.     Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

771.     Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

772.      For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 66
### Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress
### (Against Detective Raymond Dougherty)

118

773.     Plaintiff incorporates the foregoing allegations as if fully restated here.

774.     Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

775.     Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

776.     Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

777.      For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 67**
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Richard Harris)**

778.     Plaintiff incorporates the foregoing allegations as if fully restated here.

779.     Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

780.     Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

781.     Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

782.      For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 68**
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Manuel Santiago)**

783.    Plaintiff incorporates the foregoing allegations as if fully restated here.

784.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

785.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

786.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

787.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 69**
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Estate of Detective Joseph Hasara)**

788.    Plaintiff incorporates the foregoing allegations as if fully restated here.

789.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

790.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

791.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

792.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 70
### Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress
### (Against Detective Frank Jastrzembski)

793.   Plaintiff incorporates the foregoing allegations as if fully restated here.

794.   Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

795.   Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

796.   Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

797.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 71
### Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress
### (Against Detective Charles Bentham)

798.   Plaintiff incorporates the foregoing allegations as if fully restated here.

799.   Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

800.   Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

801.   Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

802.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 72**</u>
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Frank Ansel)**

803.    Plaintiff incorporates the foregoing allegations as if fully restated here.

804.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

805.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

806.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

807.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 73**</u>
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective John Cimino)**

808.    Plaintiff incorporates the foregoing allegations as if fully restated here.

809.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

810.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

811.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

812.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>COUNT 74</u>
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Estate of Detective Charles Permint)**

813.    Plaintiff incorporates the foregoing allegations as if fully restated here.

814.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

815.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

816.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

817.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>COUNT 75</u>
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Frank Miller)**

818.    Plaintiff incorporates the foregoing allegations as if fully restated here.

819.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

820.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

821.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

822.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 76**
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Gregory Rodden)**

823.    Plaintiff incorporates the foregoing allegations as if fully restated here.

824.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

825.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

826.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

827.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 77**
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective James Morton)**

828.    Plaintiff incorporates the foregoing allegations as if fully restated here.

829.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

830.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

831.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

832.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 78**
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Frank Margerum)**

833.    Plaintiff incorporates the foregoing allegations as if fully restated here.

834.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

835.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

836.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

837.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

**COUNT 79**
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Raleigh Witcher)**

838.    Plaintiff incorporates the foregoing allegations as if fully restated here.

839.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

840.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

841.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

842.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 80**</u>
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Arthur Durrant)**

843.    Plaintiff incorporates the foregoing allegations as if fully restated here.

844.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

845.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

846.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

847.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

<u>**COUNT 81**</u>
**Pennsylvania Common Law – Intentional or Reckless Infliction of Emotional Distress**
**(Against Detective Michael Burke)**

848.    Plaintiff incorporates the foregoing allegations as if fully restated here.

849.    Defendant, by extreme and outrageous conduct, intentionally or recklessly caused Christopher Williams severe emotional distress.

850.    Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

851.    Plaintiff was injured as a proximate result of Defendant's outrageous conduct and suffered damages.

852.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 82
### *Respondeat Superior* Liability
### (Against City of Philadelphia)

853.    Plaintiff hereby incorporates the foregoing allegations as if fully restated here.

854.    Defendants were at all relevant times employees of the City of Philadelphia acting within the scope of their employment while committing the misconduct and constitutional and common law violations alleged above.

855.    Defendants' conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, the City of Philadelphia as employer.

856.    Defendant City of Philadelphia is therefore liable as principle for all misconduct identified above with respect to the individual defendants and obligated to satisfy any judgment against these Defendants.

## PRAYER FOR RELIEF

Plaintiff requests the following relief from the Court:

a.    Compensatory damages against all Defendants in an amount to be determined by a jury;

b.    Punitive damages against all Defendants (except for City of Philadelphia and Philadelphia DA's Office) in an amount to be determined by a jury;

c.    Pre-judgment and post-judgment interest as allowable by law and as ordered by the Court;

d.    Attorney fees' as allowable by law and as ordered by the Court;

e.    Reasonable costs; and

f.    Such other relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims herein.

/s/ John J. Coyle
John J. Coyle
McEldrew Young Purtell Merritt
123 South Broad Street, Suite 2250
Philadelphia, PA 19109
P. (215) 545-8800
jcoyle@mceldrewyoung.com
*Local Counsel*

Ben Crump*
BEN CRUMP LAW
122 S. Calhoun Street
Tallahassee, Florida 32301
P. (800) 713-1222
ben@bencrump.com

Steven Hart*
Brian Eldridge*
John Marrese*
Jack Prior*
Carter Grant*
HART MCLAUGHLIN & ELDRIDGE, LLC
22 W. Washington Street, #1600
Chicago, IL 60602
P. (312) 955-0545
shart@hmelegal.com
beldridge@hmelegal.com
jmarrese@hmelegal.com
jprior@hmelegal.com
cgrant@hmelegal.com

Date:   December 1, 2021

*Attorneys for Plaintiffs*

*Seeking Pro Hac Vice Admission